2006 WY 12

**Susan Juanita SANCHEZ, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–183.

Supreme Court of Wyoming.

Jan. 20, 2006.

Representing Appellant: Kenneth M. Koski, Public Defender; and Donna D. Domonkos, Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and David L. Delicath, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, VOIGT, and BURKE, JJ., and ARNOLD, D.J.

VOIGT, Justice.

[¶ 1] In March 2004, a Carbon County jury found Susan Juanita Sanchez (the appellant) guilty of second-degree murder for shooting her boyfriend. She now appeals that conviction, claiming that the district court erred in admitting extrinsic impeachment evidence, that the prosecutor committed misconduct because he intentionally misrepresented witness testimony to the jury during closing argument, and that the district court abused its discretion in excluding evidence concerning the victim's affiliation with an "outlaw" motorcycle gang. We affirm.

## ISSUES

[¶ 2]  1.  Whether extrinsic impeachment evidence admitted by the district court was harmless error?

2.  Whether the prosecutor committed misconduct during his closing argument?

3.  Whether the district court erred in excluding evidence concerning the victim's affiliation with an "outlaw" motorcycle gang?

## FACTS

[¶ 3]  The instant case essentially revolves around four people: the appellant (who has been paralyzed on one side of her body since she suffered a stroke and who apparently uses a leg brace to help her walk), the appellant's live-in boyfriend Marvin "Lucky" Batchelor (the victim), Travis Tappan (who occasionally lived with the victim and the appellant) (Tappan), and Sam Huffman (Huffman).[1]  All four individuals spent most of the day July 15–16, 2003, drinking and partying at the appellant's residence in Rawlins.  Huffman was "too drunk" to return home later that evening, so Tappan retrieved a sleeping bag for Huffman to use in the yard, where he eventually "passed out."  Tappan also arranged a tarp and a sleeping bag in the yard for himself and the appellant.

[¶ 4]  Sometime between 1:00 and 1:30 a.m., the victim was shot once in the chest.  At 1:30 a.m., the appellant called 911 and indicated that she thought that the victim was dead.  Law enforcement officers responded to the residence, where they discovered the victim's body (with no pulse) in the yard; the victim was wearing a t-shirt and underwear, and his pants were located nearby on a chair next to a picnic table in the yard.  As the appellant exited the residence at the officers' request, the officers asked her if she possessed any weapons.  She replied "no, the gun is ... over there" (pointing to where she and Tappan had been sleeping), and officers discovered a black single-action .41 caliber Ruger handgun.  Ballistics analysis subsequently confirmed that the victim was shot with this gun.

[¶ 5]  Several witnesses provided information about the shooting. It appears that the appellant confessed to at least five different individuals that she shot the victim, and in several instances she confessed that fact more than once to the same individual.[2]  The appellant told the 911 dispatcher that she shot the victim "because he was raping" her, and numerous other statements were attributed to the appellant by the law enforcement officers who spoke with her after the shooting.  According to the trial testimony of these officers, the appellant stated that while Tappan was arranging the sleeping accoutrements in the yard, the appellant retrieved some bedding and the Ruger handgun [3] from her bedroom (she needed the gun for "her protection" because the victim became "mean" or "aggressive" when he was drinking).[4]  The appellant met Tappan in the yard and put the gun under her pillow, while the victim remained inside watching television.

[¶ 6]  As the appellant and Tappan were lying in the yard holding hands,[5] the victim appeared and ripped off their covers, and Tappan got up and ran.  The victim asked the appellant if she was "having sex" with

---

1.  Tappan and Huffman were friends, and both were also friends of the appellant and the victim.

2.  The prosecutor and the appellant's trial counsel seem to have referred to one of the appellant's tape-recorded statements during their closing arguments.  A transcript of that statement was admitted as a trial exhibit (and the tape was played for the jury) without much accompanying testimony as to the contents of the statement.  Because the trial exhibits are apparently not contained in the record on appeal, we are unable to refer to whatever the appellant may have said during that interview.

3.  The appellant stated that she did not like guns, but that the victim bought the gun for her because he was a convicted felon and was not allowed to possess a firearm.  She maintained that the gun was hers, and that it was in its holster when she went out to the yard.  The only holster that officers discovered at the scene was located in a bedroom inside the appellant's residence.

4.  The appellant told one officer that the victim had been "abusive" in the past and that she was "fearful of what he was going to do" the night of the shooting because "she had been fearful in the past."

5.  One witness indicated that the appellant and the victim had agreed to end their relationship.

Tappan and repeatedly told the appellant (in a profanity-laced exchange) to go in the house. The appellant replied that she wanted to remain outside. The victim then grabbed or pulled the appellant's legs in an attempt to get her into the house. At some point, he tried to "get on top" of her (or he "jumped" on top of her) and said "get your ass in there and I'll f\* \* \* you," and the appellant "pushed him off." The victim ultimately started walking towards the house, and away from the appellant's location. When he stopped and turned to continue yelling at the appellant, she reached under her pillow (while lying down), "pulled" the gun, and shot the victim once.[6]

[¶ 7] According to the appellant, Tappan, who was by this time next to the appellant, said "I think you killed him," and the appellant replied "[O]h, my God, we better go in and call 911." Tappan "helped [the appellant] put [her] leg brace on . . . so they could go in the house," and the appellant called 911. When asked if the victim had raped her, the appellant told an officer "no, he got on top of me and I pushed him off," and further stated that she told the 911 dispatcher that she had been raped because "she was scared when she saw [the victim lying] there on the ground."[7] The appellant maintained that Tappan "had nothing to do with it" and that she was not "covering" for him. By 3:46 a.m., the appellant's blood alcohol content was .07; the victim's blood alcohol content was .213 at the time of his death.

[¶ 8] At the scene of the shooting, Tappan provided Rawlins police officer David Ferguson several different versions (both exculpatory and inculpatory) of what happened. We will detail these statements later in this opinion. Tappan also subsequently gave another police officer several different versions of

what happened: (1) Tappan stated that he and the appellant were in the yard "getting ready to have sex" when the victim caught them. The victim "started to rape" the appellant,[8] and the appellant shot the victim; (2) Tappan then stated that the Ruger handgun was his, that the officer was "going to pin it on [Tappan] anyway," and that Tappan shot the victim; and (3) Tappan also stated that the victim exited the house with a gun, so Tappan shot the victim. Tappan admitted that he had consumed "a lot" of alcohol and was "very drunk" that night; by 3:57 a.m., Tappan's blood alcohol content was .30.

[¶ 9] Huffman stated that he was awakened because the appellant and the victim were arguing in "loud voices." The victim asked the appellant if she was having sex with Tappan and the appellant replied "no." He heard the appellant yell "[H]elp me, [Tappan]" while the victim was "helping" the appellant into the house. Huffman then heard the gunshot, sat up, and heard the appellant ask "[I]s he dead, [Tappan]?" Tappan replied "[Y]es, he was shot with a .44." Huffman saw the appellant and Tappan walk back over to the area where they had been sleeping. He heard Tappan tell the appellant (who was standing) "here, Sue, get your fingerprints all over this" because "if they convict me, I will go to the penitentiary, and you can say that [the victim] was beating you up and raping you and you will get off. Say something fancy." He also saw Tappan hand the appellant a "black object" with a "belt [or] something hanging down from the holster." Huffman believed that the object was the gun. The appellant and Tappan then left the area. Tappan came out looking for something and returned to the house.

[¶ 10] Two neighbors also provided information about the shooting. One neighbor,

---

**6.** Ballistics analysis revealed that the trigger had been pulled twice, once on an empty chamber.

**7.** However, the appellant told another officer that when the victim was drinking, he would stay up late and come into the bedroom and "try to have sex with her." The victim was "real forceful and mean," but the appellant would "push him away." The appellant seemed to indicate at another point in that interview that the victim had forced her to have sex with him and that this was why she "thought" the victim was going to

rape her when she "grabbed the gun." The appellant denied that the victim had otherwise "physically abused" her.

**8.** Tappan told a different officer who requested that he provide a biological sample based on the appellant's statement that she had been raped: "Damn right there was an assault. [The victim] was raping her and I [Tappan] had my underwear around my ankles. How do you think that made me feel about not being able to help her?"

who was a friend of the victim and the appellant, was awakened at "a little after 1:00" a.m. when she heard the victim's voice "louder than usual." When she heard the gunshot, the neighbor went and looked out her window. She saw the appellant "sitting up," while a shirtless Tappan retrieved the appellant's leg brace from a clothesline. Tappan knelt down and helped the appellant "strap the brace on," and Tappan helped the appellant walk to the house. Tappan returned briefly to look for something, and then went back into the house. The other neighbor returned home from work at about 1:00 a.m. and heard voices coming from the appellant's yard. The victim was repeatedly asking the appellant what she was doing "naked" in the back yard, accused the appellant of having sex with Tappan, and told the appellant to go in the house. The neighbor may have heard the appellant reply that she and Tappan were trying to "warm up," and also say "don't hit me, don't touch me" during the incident. She also saw Tappan (dressed in shorts and a t-shirt) tip-toe up her driveway and look towards the appellant's yard through a hole in the fence. After the neighbor went inside to care for her infant child, she heard the gunshot.

[¶ 11] The appellant and Tappan were ultimately both charged with second-degree murder, in violation of Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2005), and the two cases were joined for a jury trial. However, Tappan apparently pled guilty to "being an accessory before the fact" a week prior to the trial, and the appellant's case proceeded to trial. The appellant's trial strategy was essentially to claim that Tappan shot the victim, but if the appellant shot the victim, she acted in self-defense. The district court instructed on the elements of voluntary manslaughter, and the appellant also referenced that instruction during closing argument. A jury found the appellant guilty of second-degree murder in March 2004, and the district court sentenced the appellant to imprisonment for twenty- to twenty-five years. The appellant now appeals from that judgment and sentence.

## DISCUSSION

### Impeachment of Tappan

[¶ 12] The appellant subpoenaed Tappan to testify at trial, but Tappan's counsel informed the prosecutor and the appellant's trial counsel that Tappan would invoke the Fifth Amendment if he were called as a trial witness. The parties apparently then agreed that the appellant would simply elicit inculpatory statements attributed to Tappan from other trial witnesses. Accordingly, the appellant called Officer David Ferguson, who had been assigned to monitor Tappan and Huffman at the scene of the shooting, to testify during the appellant's case. Officer Ferguson testified that it "was not unusual to see [Tappan] intoxicated" and that Tappan's speech on the night of the shooting was very slurred. According to the officer, Tappan spontaneously volunteered the following information:

1. Tappan first stated that he "was sleeping during the incident so he didn't know what happened";

2. Tappan then stated that he saw the appellant shoot the victim and that the appellant was "being raped" by the victim;

3. Tappan next stated that he shot the victim, that he could not "let [the appellant] go down for something [Tappan] did," and indicated that the officer should handcuff him; and

4. After the officer advised Tappan of his *Miranda* rights and activated a tape recorder, Tappan reiterated that he saw the appellant shoot the victim with a .41 caliber Ruger handgun because the victim was "going to go inside the house and retrieve another pistol" and "if somebody was going to get shot with that [pistol], they were going to go down."

[¶ 13] The prosecutor proceeded briefly to cross-examine Officer Ferguson regarding a September 2002 encounter between the officer and Tappan in which the officer responded to a call that a "very intoxicated" man had "collapsed" at a local bar. When the officer asked Tappan "how he happened to be down," Tappan first stated that he believed "somebody hit him and then fell," but then stated that he had "fallen off the

barstool." Tappan began crying and indicated that he "was very upset about some family problems."

[¶ 14]   The appellant's trial counsel objected to the prosecutor questioning Officer Ferguson about the September 2002 incident. After hearing argument from both parties, the district court concluded that if Tappan had testified at trial, his credibility would have been subject to attack by the prosecution, and that the September 2002 incident was a fair and relevant attack on Tappan's credibility.   On appeal, the appellant contends that the testimony at issue was irrelevant, inadmissible under W.R.E. 404(b), and amounted to improper impeachment under W.R.E. 608(b).[9]

[¶ 15]   Even if we were to assume, for purposes of this appeal, that the district court erred in admitting the testimony at issue, the appellant must still demonstrate that such an error warrants a reversal of her conviction.   *See Ryan v. State*, 988 P.2d 46, 52 (Wyo.1999).   "An error warrants reversal only when it is prejudicial and it affects an appellant's substantial rights," and it is the appellant's "burden to establish that an error was prejudicial."   *Candelaria v. State*, 895 P.2d 434, 439–40 (Wyo.1995), *overruled on other grounds by Allen v. State*, 2002 WY 48, ¶ 43, 43 P.3d 551, 566 (Wyo.2002).   *See also* W.R.Cr.P. 52(a) (any "error, defect, irregularity or variance which does not affect substantial rights shall be disregarded") and W.R.A.P. 9.04 (any "error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court").   An error

is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant had the error never occurred.   To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.

*Law v. State*, 2004 WY 111, ¶ 25, 98 P.3d 181, 190 (Wyo.2004) (internal quotation and citations omitted).

[¶ 16]   The appellant contends, in a single paragraph in her appellate brief, that Tappan's inculpatory statements were "vital to the defense and impeachment of those statements was prejudicial" because the evidence against her was not overwhelming and pointed "more towards [Tappan's] guilt" than her own guilt.   In that regard, the appellant merely notes that Tappan made an incriminating statement to Officer Ferguson (although he also made exculpatory statements), Huffman testified that he overheard Tappan make an incriminating statement shortly after the shooting, and Tappan had a single particle on each hand that was consistent with gunpowder residue.[10]

[¶ 17]   Our review of the evidence received at trial reveals that Tappan's credibility did not hinge upon the fact that he, while intoxicated and emotionally unstable, previously gave Officer Ferguson two accounts of how he came to rest on a barroom floor. Very brief testimony to that effect (which testimony the prosecutor did not refer to either during his opening statement or his closing argument) was negligible compared

---

9.   The potential admissibility of this testimony pursuant to W.R.E. 806, W.R.E. 608(b), and W.R.E. 611(b) poses several interesting questions.   *See generally* 3 and 4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, §§ 306, 311, 511 (2d ed.1994 and Supp. 2005); Alan D. Hornstein, *On the Horns of an Evidentiary Dilemma: The Intersection of Federal Rules of Evidence 806 and 608(b)*, 56 Ark. L.Rev. 543 (2003); and Margaret Meriwether Cordray, *Evidence Rule 806 and the Problem of Impeaching the Nontestifying Declarant*, 56 Ohio St. L.J. 495 (1995).   However, we do not feel compelled to address these issues, particularly when some of the issues are not addressed in the parties' appellate briefing and the disputed testimony did not affect the appellant's substantial rights.

10.   Gunshot residue tests revealed that neither the appellant, nor Huffman, had any particles consistent with gunshot residue on their faces or hands, and that the appellant's shirt did not contain any particles consistent with gunshot reside.   Tappan had one particle consistent with, but not necessarily "unique to," gunshot residue on each hand, but none on his face.   An expert witness testified that such particles can be deposited by firing a gun, being in the proximity of a gun that is being fired, or by secondary transfer (i.e. picking up a gun that someone else has fired).   The particles "do not remain resident" on "hand surfaces" for long periods of time and can be eliminated relatively quickly by normal activity or by washing or wiping one's hands.

to the other much more significant evidence that was available to the jury in evaluating Tappan's credibility, including:

1. Tappan's intoxication level the night of the shooting, and the intoxication levels of the appellant and Huffman;

2. The contents of Tappan's statement to Officer Ferguson, wherein he first claimed that he was asleep and did not know what happened, then claimed that he saw the appellant shoot the victim while the victim was raping her, then claimed that he shot the victim and should be handcuffed, and finally claimed (when advised of his *Miranda* rights and that his statement was going to be recorded) that he saw the appellant shoot the victim because the victim was going back to the house to retrieve a gun with which to shoot someone;

3. How Tappan's statement to Officer Ferguson compared with Huffman's testimony, the statements attributed to the appellant, and the testimony of other witnesses who observed what happened shortly after the shooting;

4. How Tappan's statement to Officer Ferguson compared with his statements to other law enforcement officers;

5. Tappan's potential motivations for giving inculpatory and/or exculpatory statements; and

6. The physical evidence.

[¶ 18]   That being the case, we cannot find that there was a reasonable possibility that the verdict might have been more favorable to the appellant if the testimony at issue had been excluded. While the record contained some evidence to support the appellant's theory that Tappan shot the victim, the appellant does not endeavor on appeal meaningfully to analyze the weight of the totality of the evidence. Merely characterizing the state of the record and referring to a few pieces of evidence that support a particular theory does not persuade us that a reversal of the appellant's conviction is warranted under the circumstances.

## Prosecutorial Misconduct

[¶ 19]   The appellant next asserts that the prosecutor committed misconduct because he intentionally misstated Huffman's testimony and misled the jury during closing argument.

### Standard of Review

■■■   Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether the accused's case has been so prejudiced as to constitute the denial of a fair trial. *English v. State*, 982 P.2d 139, 143 (Wyo.1999) (quoting *Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998); *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997)). The propriety of any comment within a closing argument is judged "in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial." *Wilks* [*v. State*, 2002 WY 100], at ¶ 26, [49 P.3d 975, 986 (Wyo.2002)] (citing *Burton v. State*, 2002 WY 71, ¶ 11, 46 P.3d 309, ¶ 11 (Wyo.2002)). The burden of proving prejudicial error rests with the appellant. *Wilks*, at ¶ 26; *see also Taylor* [*v. State*, 2001 WY 13], at ¶ 19, [17 P.3d 715, 722 (Wyo.2001)]; *Tennant v. State*, 786 P.2d 339, 346 (Wyo.1990).

Where, as in this case, no objection is raised at trial to the prosecutor's alleged misconduct, the standard of review is plain error, which demands:

> First, the record must be clear as to the incident which is alleged as error. Second, the party claiming the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove a substantial right has been denied him and, as a result, he has been materially prejudiced.

*Wilks*, at ¶ 7 (quoting *Worcester* [*v. State*, 2001 WY 82], at ¶ 7, [30 P.3d 47, 50 (Wyo. 2001)]).

*Duke v. State*, 2004 WY 120, ¶¶ 100-01, 99 P.3d 928, 957 (Wyo.2004), *cert. denied*, ─── U.S. ───, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005).

Closing arguments must be based upon the evidence submitted to the jury. The

purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence. *Hopkinson v. State*, 632 P.2d 79, 145 (Wyo.1981). Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon.... There are limits, however, on prosecutor's closing arguments that are designed to insure the fairness of the trial and prevent compromise of the judicial system.

*Dysthe v. State*, 2003 WY 20, ¶ 24, 63 P.3d 875, 884–85 (Wyo.2003). In *Wilks v. State*, 2002 WY 100, ¶ 27, 49 P.3d 975, 986–87 (Wyo. 2002), we stated in relevant part:

In *Trujillo v. State*, 2002 WY 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002), this court set forth the following broad guidelines found in the Standards for Criminal Justice which are applicable to a prosecutor's arguments to a jury:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

**Discussion**

[¶ 20] Huffman's testimony and the prosecutor's closing argument appear clearly in the record. We have previously summarized Huffman's trial testimony, but we find the following excerpts of that testimony to be particularly relevant to our discussion of this issue:

[The prosecutor:] Okay. What's the next thing that happens?

A. And I was there a little bit, and then [Tappan and the appellant] come walking back over to the bedroll where they was at.

Q. Did you see them walk back over?

A. I could see them. It was dark, but could make out the obvious.

Q. Then what happens?

A ... He said, here, Sue, get your fingerprints all over this. Because, he said, if they convict me, I will go to the penitentiary, and you can say that Lucky was beating you up and raping you and you will get off. Say something fancy.

. . .

Q. Okay. And where is Sue while he's saying this?

A. Well, she was standing over by where they were sleeping.

. . .

Q. Were you able to tell [the police] about the conversations?

A. No.

Q. Okay. When did you remember the conversations?

A. Well, some of it didn't come right to me right then.

Q. When did they come to you?

A. A couple days before I could really get the memory.

Q. Why is that?

A. Because some of that I thought was a dream.

. . .

Q. Okay. So it took you a couple days for it to all settle in your mind?

A. Yeah, yes.

Q. You weren't sure at the time what you heard?

A. Not really sure, no.

. . .

[The appellant's trial counsel:] And you saw [Tappan] hand something to Sue, and you thought it was the gun. Do you remember saying that?

A. Yes.

Q. And you heard [Tappan] say, here, take it, Sue, you need to get your fingerprints on it. Now, you remembered that back early morning of the 16th, didn't you?

A. Yes.

. . .

[The prosecutor:] Now, Sam, this thing that [Tappan] passed through hands to Sue, you just said it had like a holster hanging down?

A. Yes. It was a black object, and it had a belt [or] something hanging down from the holster. I mean, it was like a black object.

Q. Okay. Not possible it was her brace?

A. No.

Q. Absolutely sure?

A. I would be sure.

Q. Okay. And then she stands up?

A. She was standing.

Q. Okay. Sue needs a brace to stand?

A. Yeah, she needs her brace, I guess. I don't know.

Q. Do you remember her getting her brace on that night?

A. No, I don't.

[¶ 21] The appellant claims that the prosecutor intentionally misrepresented this testimony to the jury by stating the following during his principal closing argument:

The last thing is Mr. Huffman. Mr. Huffman is an essential witness for the State. This is a man who has passed out, basically. He is [awakened] by some yelling, some arguing that's going on, and he hears parts of it. Now, how do we know it's parts? Because he saw [Tappan] hand a dark object to Susan. Get your fingerprints on this.

The key word in that incidentally is not fingerprints, the key word is on, because you remember what Susan said in the interview, I asked [Tappan] to get my brace and get this on. And Mr. Huffman did not see her get the brace, other than it's being handed by . . . Tappan. So what we have are gaps in what he heard and saw.

The appellant first points out that Huffman testified that Tappan told the appellant to "get [her] fingerprints all over this," while the prosecutor stated "[g]et your fingerprints on this" and proceeded to emphasize the significance of the word "on" according to the prosecutor's particular view of the evidence. However, we cannot say that the prosecutor intentionally mischaracterized Huffman's testimony in this regard because such a characterization is not without an evidentiary basis in the record. The following colloquy occurred during the cross-examination of Huffman:

[The appellant's trial counsel:] And you heard [Tappan] say, here, take it, Sue, you need to get your fingerprints on it. Now, you remembered that back early morning of the 16th, didn't you?

[Huffman:] Yes.

It is also worth noting that the appellant's trial counsel characterized Huffman's testimony in a similar manner during her own closing argument:

Now, there is another person there, and that's Sam. Sam said he was awakened by arguing. He heard a shot. He looked over and he saw [Tappan] handing the gun to Susan. He heard [Tappan] say to Susan, take this, *get your fingerprints on it,* tell them Lucky was raping you and that you shot him.

(Emphasis added.)

[¶ 22] The appellant further contends that the prosecutor misled the jury by stating that there were "gaps in what [Huffman] heard and saw" and misrepresented Huffman's testimony to reflect the prosecutor's theory that Huffman overheard Tappan and the appellant discussing the appellant's leg brace, rather than the gun used to shoot the victim. According to the appellant, "Huffman's testimony did not support [this] theory" because he was adamant that he saw Tappan hand the gun to the appellant and was "sure" it was not her leg brace because the appellant was already standing during her conversation with Tappan. The prosecutor was therefore merely "advancing his theory and calling it evidence" during his closing argument.

[¶ 23] We find that the prosecutor was suggesting reasonable inferences that could be made from the evidence received at trial during his closing argument. Considering the circumstances surrounding the shooting, Huffman's testimony, and other witness statements and testimony, it was not unreasonable for the prosecutor to suggest that there were "gaps" in what Huffman observed or overheard, or that Huffman may have been mistaken in that regard. Huffman, who was "too drunk" to return home and "passed out" in the yard earlier in the evening, had been awakened in the middle of the night when he heard the appellant and the victim arguing. After the shooting, he had trouble remembering what happened and was unable

to provide some of that information to the police the night of the shooting—it was a "couple days before [he] could really get the memory" because he was not really sure what he heard and that he thought some of it was a "dream." There is also some indication in the record that Huffman wore glasses and that law enforcement officers discovered the glasses in the area where he had been sleeping on the night of the shooting.

[¶ 24] In addition, the prosecutor specifically referred to the appellant's statements during the above-quoted excerpt of his closing argument. Huffman testified that he did not remember the appellant putting her brace on. However, the appellant said that she was lying down when she pulled the gun and shot the victim, and that Tappan then helped her put on the leg brace before they went into the house. We note that a neighbor also testified that she saw the appellant "sitting up" after the gunshot, and then saw Tappan retrieve the appellant's leg brace from the clothesline, help the appellant "strap" on the brace, and assist the appellant as she walked to the house.

[¶ 25] We conclude that the prosecutor did not misrepresent Huffman's testimony, but merely suggested inferences that could be made about Huffman's testimony if it were viewed in the context of his physical and mental state and what other witnesses observed during the same time period. It was not unreasonable for the prosecutor to suggest (despite the certainty Huffman professed) either that Huffman may not have seen everything that occurred that night, or that he may have been mistaken about what he had seen or heard. Accordingly, the appellant has not demonstrated that the prosecutor's closing argument violated a clear and unequivocal rule of law.

### Motorcycle Gang Affiliation Evidence

[¶ 26] At trial, the appellant sought to introduce photographs of a Grim Reapers "biker vest" that purportedly belonged to the victim, and to then call Carbon County sheriff's deputy Richard Fowler to testify regarding the significance of a patch displayed on the vest and the general manner in which women are treated by "outlaw" motorcycle gang members.[11] In particular, Deputy Fowler testified (as an offer of proof) that one patch on the vest was an "earned" patch indicating that "one percent of the American public who ride motorcycles ... don't believe in laws, they are considered outlaws." He further testified (without any specific knowledge of the Grim Reapers' gang culture) that "outlaw motorcycle culture views women [as] a subculture"—single women have no rights or privileges within the gang, are considered property of the gang and its members (women can be "prostituted, sold, bought, traded at will" and disciplined), and exist for the sexual pleasure and economic benefit of the gang members.

[¶ 27] The district court excluded this evidence for several reasons: (1) a sufficient foundation had not been established for Deputy Fowler to testify about the Grim Reapers motorcycle gang; (2) the testimony was not relevant because it was too general and tenuous to the circumstances of the instant case—no evidence indicated that this was a motorcycle gang "related crime or situation"; and (3) any probative value that the testimony may have had was outweighed by the danger of unfair prejudice, confusion of the issues, and the potential to mislead the jury regarding the issues of the instant case.

[¶ 28] On appeal, the appellant claims that the district court abused its discretion in excluding Deputy Fowler's testimony. According to the appellant, she established an adequate evidentiary foundation for the testimony and the testimony was relevant to rebut witness testimony elicited by the prosecutor that the appellant and the victim "had a good relationship with no signs of physical or sexual abuse," to corroborate the appellant's statements that the victim had mistreated her in the past, and to explain why

---

11. Deputy Fowler had worked for a state gang task force in Arizona for five years and attended a basic gang school and other, more specialized gang schools relating to prison gangs, motorcycle gangs and street gangs. With respect to motorcycle gangs, he testified that he knew the "mannerisms of the gang members themselves" as well as "the rituals of joining the gangs, clubs, such like that."

the appellant was afraid of the victim and took the murder weapon to the yard with her prior to the shooting.

[¶ 29] We will focus our discussion on the district court's analysis pursuant to W.R.E. 403, which rule provides that although relevant,[12] "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Our standard of review is as follows:

" 'Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion.' *Solis v. State*, 981 P.2d 34, 36 (Wyo.1999) (citation omitted). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. 'In the absence of an abuse of discretion, we will not disturb the trial court's determination.' [*Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001).] The burden is on the defendant to establish such abuse."

*Wilks*, 2002 WY 100, ¶ 19, 49 P.3d at 984 (*quoting Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766 (Wyo.2001), *cert. denied*, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002)).

[¶ 30] Evidence of an individual's gang affiliation can be probative of material issues in certain cases. *See generally, for example, Johninson v. State*, 317 Ark. 431, 878 S.W.2d 727, 730–33 (1994) (collecting cases); *People v. James*, 117 P.3d 91 (Colo. App.2004), *cert. denied*, 2005 WL 1864140 (Colo.2005); *State v. Roberts*, 261 Kan. 320, 931 P.2d 683, 686–87 (1997) (highly probative of witness bias); *State v. Tran*, 252 Kan. 494, 847 P.2d 680, 687–88 (1993) (res gestae and motive); *Butler v. State*, 102 P.3d 71, 78–79 (Nev.2004) (probative of motive); *State v. Torres*, 183 N.J. 554, 874 A.2d 1084, 1093–95 (2005) (collecting cases); and Annotation, *Admissibility of Evidence of Accused's Membership In Gang*, 39 A.L.R.4th 775 (1985 and Supp.2005).

[¶ 31] However, we find that whatever probative value Deputy Fowler's testimony arguably might have had in the instant case was diminished by the following additional facts:

1. The victim's membership in the Grim Reapers' motorcycle gang is somewhat tenuous. It appears that the only evidence of the victim's association with such a gang is that he purportedly possessed the "biker vest" at issue.[13] While the appellant's trial counsel stated in her offer of proof that the vest belonged to the victim and that the victim "belonged" to the Grim Reapers, we have not been directed to any witness testimony (contained in the offer of proof or otherwise) that the vest was indeed the victim's vest or that the victim was an active member of the gang. Deputy Fowler testified that he was not familiar with the victim personally and we are not aware of any statements by the appellant in this regard.

2. Based on Deputy Fowler's testimony, the status of the Grim Reapers in this area is dubious. According to Deputy Fowler, western chapters of the Grim Reapers "have passed over to the Hell's Angels" and are "not even included anymore as outstanding motorcycle clubs that are still active in the west," and the deputy was not familiar with

---

12. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401.

13. The photographs of the vest are not contained in the record on appeal and we are unable to determine from the record whether the vest itself, or where it was discovered, contained indicia of the victim's ownership.

any Grim Reapers chapter that may have existed in Rawlins. He also testified that there have been instances in which someone still possesses a gang's "colors" but no longer participates in the "full culture"; such an individual would typically "lay low, [and remain] low-key and out of sight, because clubs don't let them retire."

3. Deputy Fowler testified that he was only "generally" familiar with how "outlaw" motorcycle gangs treat single women and did not have any specific knowledge of the Grim Reapers' gang culture.

4. Deputy Fowler asked the appellant if she had received the gang's "colors" indicating that she was the "property of" the victim and she replied that she had not.

5. At trial, the district court allowed the appellant to elicit more specific and probative testimony as to the victim's past mistreatment of the appellant.

6. Our review of the evidence adduced at trial does not reveal a strong nexus between Deputy Fowler's testimony and the facts and issues of the instant case.

[¶ 32] With respect to the danger of unfair prejudice, we have said that trial courts "must exercise great caution so defendants will be convicted on the basis of the evidence pertinent to the crimes charged and not on the basis of evidence calculated to appeal to the jury's passions or prejudices." *Orona–Rangal v. State,* 2002 WY 134, ¶ 15, 53 P.3d 1080, 1085 (Wyo.2002). Evidence of an individual's gang affiliation can be quite prejudicial:

> Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted.

*United States v. Irvin,* 87 F.3d 860, 865 (7th Cir.), *cert. denied,* 519 U.S. 903, 117 S.Ct. 259, 136 L.Ed.2d 184 (1996) (footnote omitted). *See also Utz v. Commonwealth.,* 28 Va.App. 411, 505 S.E.2d 380, 384–88 (1998) ("a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior").[14] We have not been persuaded that similar concerns would not arise in the instant case from the admission of Deputy Fowler's testimony, despite the fact that the alleged gang member was the victim, rather than the defendant.

[¶ 33] With these considerations in mind, we conclude that the appellant has not demonstrated that the district court clearly abused its discretion in excluding Deputy Fowler's testimony pursuant to W.R.E. 403.

[¶ 34] Affirmed.

---

14. One court has further noted that "when the expert witness testimony is an investigating officer, the expert opinion may present significant danger of undue prejudice because the qualification of the officer as an expert may lend credibility to the officer's fact testimony regarding the investigation." *Torres,* 874 A.2d at 1100.