2006 WY 119

**Eddie Teniente MAGALLANES, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 05–64.

Supreme Court of Wyoming.

Sept. 26, 2006.

Representing Appellant: Tonya A. Morse, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General. Argument by Mr. Pauling.

Before VOIGT, C.J., and GOLDEN, HILL,* KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   Eddie Magallanes was convicted following a jury trial of first-degree premeditated murder in the death of Joseph Lopez and conspiracy to commit that murder. In this appeal, Magallanes challenges the adequacy of the evidence supporting those convictions and asserts claims of ineffective assistance of trial counsel and prosecutorial misconduct. Finding no merit in the issues raised by Magallanes, we affirm.

## ISSUES

[¶ 2]   Magallanes submits the following issues for our review:

I.   Whether there was sufficient evidence for the jury to find [Magallanes] guilty of murder in the first degree where the evidence failed to show a conclusive cause of death, where no witness testified that they saw [Magallanes] actually shoot the victim, and where there is no physical evidence linking the victim to the crime?

II.   Whether ineffective assistance of counsel, specifically in failing to follow up on DNA and scientific testing, denied [Magallanes] his constitutional right to a fair trial?

III.   Whether the prosecutor committed misconduct by misstating the law, vouching for the credibility of a witness, and misstating facts in closing argument?

## FACTS

[¶ 3]   During the evening hours of January 17, 2004, Joseph Lopez and his younger brother, Anthony, went to the home of Emi-

* Chief Justice at time of oral argument

lio Teniente in Greeley, Colorado. There, they met Bobby Rojas, Magallanes and his brother, Jesse Magallanes (hereinafter "Jesse"). The six young men sat around drinking, conversing, and listening to music. After a period of time, Teniente, Rojas, Lopez, Magallanes and Jesse decided to drive to Cheyenne to party.

[¶ 4]   Jesse drove that evening, and Teniente occupied the front passenger seat. In the rear, Magallanes sat behind Jesse, Lopez sat in the middle, and Rojas sat behind Teniente. At some point during the drive to Cheyenne, Lopez made an inflammatory comment to Magallanes about his mother. Magallanes became angry and began punching Lopez. Thereafter, punches were thrown by all three occupants of the back seat. When the men reached Cheyenne, Jesse stopped the car, and he and Magallanes pulled Lopez out of the vehicle. Apparently believing they intended to leave Lopez there, Teniente told them to put Lopez back in the car because "he knows who I am."

[¶ 5]   After placing Lopez back in the car, the men went to the house where Teniente's sister Sophia lived. Sophia immediately noticed blood on Lopez's face and admonished the men for fighting. She then helped Lopez clean up and gave him a clean shirt to wear while she washed the one he had been wearing. After that, things calmed down between the men and they sat around drinking and talking with Sophia and one of her female friends, Vanessa Hernandez. Approximately two hours later, Teniente suggested they return to Greeley, and the five men left Sophia's house.[1]

[¶ 6]   Shortly thereafter, Lopez began to scold the others for hitting him earlier. He told them they should have killed him and that they needed to take care of him before they returned to Greeley because his family would get revenge for the beating he had taken. At that point, Magallanes struck Lopez, and Teniente pulled out his .25 caliber semi-automatic pistol, pointed it at Lopez's head and told him to shut up. Teniente then

directed Jesse to drive to Campstool Road. When they arrived at the College Drive overpass on Campstool Road, Magallanes and Teniente had Jesse stop the vehicle under the bridge.

[¶ 7]   Magallanes removed Lopez from the car and started beating and kicking him, eventually driving him to the ground. By this time, Jesse and Teniente were outside the vehicle. While Jesse attempted to stop the fracas, Teniente passed his pistol to Magallanes and told him to "shoot that guy." Magallanes then shot Lopez twice in the head, once above the left ear and once toward the back of the head. The four men left Lopez on the road and returned to Sophia's house, where Magallanes and his brother dropped off Teniente and Rojas before heading home. Approximately forty-five minutes later, around 2:00 a.m., Sophia and Hernandez drove Teniente and Rojas back to Greeley.

[¶ 8]   Shortly before 2:00 a.m., Michael Hampton, a security officer for Frontier Refinery, left the refinery and drove east on Campstool Road. As he approached the area of the overpass, he saw what appeared to be debris on the roadway and attempted unsuccessfully to swerve and avoid it. After hitting it, Hampton stopped his vehicle and discovered that the object was the body of a young man. The Laramie County Sheriff's Office was immediately contacted.

[¶ 9]   During the ensuing investigation, law enforcement learned that Lopez had accompanied Teniente and others to Cheyenne the previous evening. Law enforcement's investigation into Lopez's murder, however, was hampered by an orchestrated effort to cover up what had taken place in Cheyenne. As part of the cover-up, Rojas, Jesse, Sophia and Hernandez told a similar fabricated story that Lopez had left Sophia's home by himself and never returned, and conveniently failed to mention Magallanes' presence in Cheyenne on the night in question. Those fabrications started to unravel when Sophia was arrested for possession of a controlled substance.

---

**1.**   Jesse, once again, drove the car and the other men got in the seats they occupied on the trip to

Cheyenne.

[¶ 10] Based on information obtained from the ongoing investigation, the State charged Magallanes with the premeditated murder of Lopez and with conspiring with Teniente to commit that murder. In September 2004, a jury found him guilty on both charges. The district court sentenced Magallanes to concurrent terms of life imprisonment without the possibility of parole. This appeal followed.

## DISCUSSION

### Issue I—Evidentiary Sufficiency

[¶ 11] Magallanes contends that his conviction for first degree murder cannot stand because: (1) the State failed to conclusively prove Lopez's death was caused by the bullet wounds to his head; (2) no witness actually saw Magallanes shoot Lopez; and (3) there was no physical evidence linking Lopez to the crime.[2] In reviewing Magallanes' sufficiency of the evidence claim, we must determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Vlahos v. State*, 2003 WY 103, ¶ 36, 75 P.3d 628, 637 (Wyo.2003). We do not consider conflicting evidence presented by Magallanes, and afford to the State every favorable inference that may be reasonably and fairly drawn from the evidence it presented. *Id.*, ¶ 36, 75 P.3d at 637–38. We have consistently held that it is the jury's responsibility to weigh the evidence, assess the credibility of the witnesses and resolve conflicts in the evidence. *Leyo v. State*, 2005 WY 92, ¶ 11, 116 P.3d 1113, 1116–17 (Wyo.2005). We will not substitute our judgment for that of the jury when applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals could have come to the same result as the jury did. *Id.; Vlahos*, ¶ 36, 75 P.3d at 638.

[¶ 12] Magallanes' complaint concerning the cause of Lopez's death rests largely on selected portions of the testimony of Dr. Stephen Cina, the forensic patholo-gist who autopsied Lopez. Dr. Cina testified he could not determine whether Lopez died before or after being run over by Hampton's vehicle, but that Lopez would not have been exposed to that vehicle had the gunshots not left him incapacitated and lying in the roadway. Magallanes argues this latter conclusion is unsupported by the record, speculating that Lopez may have been shot someplace other than the road and somehow managed to move himself onto the road after being shot twice in the head.

[¶ 13] In advancing this argument, Magallanes ignores the evidence that after his brother pulled over on Campstool Road—presumably on the right hand side of the road—Rojas remained seated on the right hand side of the rear passenger seat. Thus, when Magallanes, who was seated behind the driver, pulled Lopez out of the back seat and began to beat him, those activities can reasonably be inferred to have occurred on the road. Magallanes also ignores that the .25 caliber shell casings were also found on Campstool Road in close proximity to Lopez's body.

[¶ 14] Magallanes further fails to note evidence indicating that Hampton's vehicle did not hit Lopez's body until shortly before 2:00 a.m., which was approximately the same time Sophia and her friend embarked for Greeley to take Teniente and Rojas home and approximately forty-five minutes after Magallanes shot Lopez. That lapse in time is significant because, although Dr. Cina testified that the gunshot wounds to the brain might not have immediately resulted in death, and that the injuries caused to Lopez's body by Hampton's vehicle occurred either shortly before or shortly after Lopez expired, he also testified the bullet wounds would have incapacitated Lopez. Furthermore, Dr. Cina testified that Lopez had aspirated blood from those wounds and, from the amount of such blood discovered, Lopez could have been gasping for breath only for a short time after being shot.

---

2. Magallanes also seems to suggest that insufficient evidence exists to sustain his conspiracy conviction. The adequacy of that evidence has not been properly raised as an issue before this Court. Additionally, Magallanes has failed to provide this Court with a cogent legal analysis supporting such a claim. We will therefore not consider it further. *Duke v. State*, 2004 WY 120, ¶ 49, 99 P.3d 928, 946 (Wyo.2004).

[¶ 15] From that evidence, a rational jury could have reasonably inferred that Lopez was shot in the roadway and left there to die. A rational jury also could have reasonably concluded that the bullet wounds immediately rendered Lopez incapable of moving and, after a few minutes, no longer capable of gasping for breath, and that death's door was swinging shut, if not already closed, when Hampton encountered him that morning. We find ample evidence in the record to support a reasonable conclusion that Lopez's death was a direct result of the bullets Magallanes discharged into his head. Magallanes has not convinced us otherwise.

[¶ 16] Similarly unpersuasive is Magallanes' claim that the evidence supporting his murder conviction is inadequate because neither of the two eyewitnesses testifying at trial, Jesse and Rojas, stated they actually saw him fire the bullets into Lopez's head. The record reveals that both witnesses testified Magallanes was the last person to handle the gun prior to the shooting. Jesse testified Lopez was on the ground when Magallanes pointed the gun towards the ground and fired it twice. Additionally, Rojas testified that, after observing Magallanes fumbling with the gun, he saw him go towards Lopez and then heard two gun shots. Rojas further testified that when Magallanes returned to the car following the shooting, he stated that he had shot Lopez both in the forehead and the back of the head. A rational jury could easily conclude from that evidence that it was Magallanes who killed Lopez.

[¶ 17] Magallanes' final claim, as set forth in the title of his argument, is that there "is no physical evidence linking [Lopez] to the crime." Magallanes, however, has not mentioned, let alone developed, this claim in the body of his argument. Needless to say, we will not address it.

### Issue II—Ineffective Assistance

[¶ 18] Magallanes contends that trial counsel rendered ineffective assistance. We evaluate Magallanes' claim under the following standard:

In reviewing claims of ineffective assistance of counsel, our paramount consideration is whether, in light of all the circum-stances, trial counsel's acts or omissions were outside the wide range of profession-ally competent assistance. *Gleason v. State*, 2002 WY 161, ¶ 44, 57 P.3d 332, [346–47] (Wyo.2002). An appellant claim-ing ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Ordinarily, he must also demonstrate that prejudice resulted. Under this test, the inquiry is whether or not counsel rendered the assistance a reasonably competent at-torney would have offered and, if not, whether his failure to do so prejudiced the defense of the case. *Id.* This two-part test, the Strickland test, is the test we normally apply in reviewing ineffectiveness claims. . . .

We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of profes-sionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Gleason*, 2002 WY 161, 57 P.3d 332. We do not evaluate the efforts of counsel from a per-spective of hindsight but endeavor to re-construct the circumstances surrounding the challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. *Dickeson*, 843 P.2d at 609. We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judg-ment. *Id.* The burden is on the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be consid-ered sound trial strategy. *Id.*

*Leyva v. State*, 2005 WY 22, ¶ 19, 106 P.3d 873, 878 (Wyo.2005) (quoting *CLC v. State*,

2004 WY 2, ¶ 11, 82 P.3d 1235, 1238–39 (Wyo. 2004)). We have also stated that an appellant assailing counsel's assistance must provide more than mere speculation or equivocal inferences. *Duke v. State*, 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo.2004), *cert. denied*, 544 U.S. 1062, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005).

[¶ 19] Magallanes' allegations of ineffectiveness concern trial counsel's failure to have DNA testing performed on fingernail scrapings taken from Lopez, to have the car driven that night checked for fingerprints and tested for blood or other biological specimens, and to have testing performed on the shirt Lopez left at Sophia's house. Magallanes' attack on counsel's performance rests entirely on his speculation that such testing would have uncovered exculpatory evidence and discounts the possibility that it could have adversely affected the theory of defense presented at trial.

[¶ 20] The record reveals that Magallanes defended against the charges on the theory that he was not in Cheyenne the night Lopez was killed, that the initial statements given by all who saw Lopez in Cheyenne that night indicated as much, and that those witnesses changed their stories only after being pressured to do so by law enforcement and Lopez's family. Defense counsel drew the jury's attention to such matters during his examination of witnesses and in his opening and closing statements. To complement that defense, trial counsel attacked the State extensively for not having tests performed to identify fingerprints and biological specimens that were gathered, or could have been gathered, during its investigation of the case. That attack, in part, addressed the very items which Magallanes now claims trial counsel should have tested.

[¶ 21] It is clear from the record that trial counsel's strategy was to use the unknown nature of the untested evidence to Magellanes' advantage by suggesting it would have shown he had no contact with Lopez on the night of the murder, a defense that could not have been pursued had testing of that evidence linked Magallanes to the crime. Trial counsel further argued the State purposely did not test the evidence because it feared the results would weaken its case against Magallanes. Counsel would have had to sacrifice that aspect of Magallanes' defense if he had the evidence tested. When viewed in this context, trial counsel's strategic decision to forego testing was well within sound trial strategy of a reasonably competent attorney. We will not second guess counsel.

### Issue III—Prosecutorial Misconduct

[¶ 22] In his final claim of error, Magallanes identifies several statements made by the prosecutor during closing arguments and argues they constitute misconduct. Specifically, Magallanes claims:

1. The prosecutor misstated the law as to the State's burden of proof on the conspiracy charge when he stated in rebuttal closing:

> Emilio handed the gun, Jesse handed the gun to Eddie. Which one is it? I don't know. It just doesn't matter. Who cares? The fact is the gun was in his hand. He's the one with the gun. I don't care who gave it to him. He's got the gun. He makes the choice. Bam, twice. Who cares? It just doesn't matter.

* * * *

> Ladies and gentlemen, we are here because he executed him. Keep your eye on the ball. I don't care who gave him the gun. He used the gun deliberately twice. He and Emilio, thinking along the same lines, we'll take care of it.

2. The prosecutor improperly vouched for Jesse's credibility by stating:

> [Eddie's] the one who pulls Joe out of the car, beats on him. Eddie's the one that takes the gun from Emilio, and you saw Jesse testify from that stand. It was not comfortable for him to have to testify against his own brother. It was difficult, but he had the courage to say, "My brother shot him twice in the head." We had to drag him here, but he testified.

3. The prosecutor misrepresented Jesse's testimony when he said in rebuttal:

> The critical thing that the two eyewitnesses and the corroborating evidence tells you is on this particular critical date, this defendant, by the testimony of Jesse Magallanes, who had to point at his own brother and say, "He shot him," Bobby had to point at his cousin and say, "I heard it, but then he told me, 'I shot him twice in the head.'" That's why we're here.

4. The prosecutor misrepresented the testimony as to what brand of beer Magallanes and his friends consumed on the night of Lopez's murder by stating in rebuttal:

> Remember in the investigation after all the initial interviews completed by the 22nd, what is the one beer they all drank? Bud Light. Bud Light all night long. Bud Light, Bud Light, Bud Light, and Lord Calvert whiskey.
>
> So there's a Keystone beer can out in the area of the homicide. All they did was overcollect the scene. I would submit that beer can had nothing to do with this case. All they drank was Bud Light, so we knew that we're focused on the investigation, and you move forward. All we had at that scene for physical evidence are the casings and the body of Joe, and Joe's not talking.

[¶ 23] "Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether the accused's case has been so prejudiced as to constitute the denial of a fair trial." *Duke,* ¶ 100, 99 P.3d at 957. This Court judges the propriety of any comment within a closing argument "in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial." *Id.* (quoting *Wilks v. State,* 2002 WY 100, ¶ 26, 49 P.3d 975, 986 (Wyo.2002)). We have consistently stated that the purpose of closing argument is to permit both the prosecution and defense counsel to offer ways of viewing the significance of the trial evidence. *Sanchez v. State,* 2006 WY 12, ¶ 19, 126 P.3d 897, 904–05 (Wyo. 2006); *Moe v. State,* 2005 WY 58, ¶ 20, 110

P.3d 1206, 1214 (Wyo.2005). Prosecutors, like defense counsel, are entitled to review the evidence and suggest to the jury inferences that may be reasonably drawn from that evidence. *Id.*

[¶ 24] In the instant case, Magallanes did not object at trial to the alleged incidents of misconduct. Therefore, his claims must be evaluated under the doctrine of plain error, which requires: (1) the record be clear as to the incident alleged as error; (2) Magallanes demonstrate the existence of a clear and unequivocal rule of law which was violated in a clear and obvious, not merely arguable, way; and (3) Magallanes prove the error adversely affected a substantial right which materially prejudiced him. *Duke,* ¶ 101, 99 P.3d at 957. In order to satisfy the prejudice prong, Magallanes must demonstrate a reasonable possibility that, in the absence of the alleged errors, the outcome of his trial would have been more favorable to him. *Lopez v. State,* 2004 WY 103, ¶ 56, 98 P.3d 143, 157 (Wyo.2004).

[¶ 25] Despite acknowledging his heightened burden of establishing plain error, Magallanes has not presented this Court with a plain error analysis on his misconduct claims. Magallanes' argument consists of isolated excerpts from the prosecutor's closing arguments without a legal analysis explaining the rule of law allegedly transgressed by the prosecutor's statements. Magallanes also fails to provide any explanation, within the context of the record, how the challenged comments materially prejudiced him. Instead, he provides only a singular assertion that the prosecutor's remarks "adversely effected [sic] Appellant's rights, including his constitutional right to a fair trial as guaranteed by the United States Constitution and the Wyoming Constitution." Merely asserting prejudice without a factual presentation from the record is wholly insufficient to satisfy the plain error standard. *Doherty v. State,* 2006 WY 39, ¶ 23, 131 P.3d 963, 971 (Wyo.2006). While we could summarily reject Magallanes' misconduct claims because of the identified deficiencies, due to the severity of the charges against Magallanes we have taken it upon ourselves to independently examine the challenged com-

ments in light of the entire record and applicable legal principles and conclude that Magallanes' complaints are meritless.

[¶ 26] Since we continue to see complaints of misconduct arising from remarks made by prosecutors during closing arguments, we take this opportunity to remind litigants of what we said in *Butcher v. State,* 2005 WY 146, ¶ 50, 123 P.3d 543, 558 (Wyo. 2005) (internal citation omitted):

We have said many times that we are reluctant to find plain error in closing arguments because we do not want to place the district court in the position of having to act as opposing counsel. We would expect that appellate counsel would begin to take us at our word in that regard, and would raise as plain error only those closing arguments that did, indeed, violate an unambiguous rule of law in an unambiguous manner, and that, at least arguably, resulted in prejudice to the appellant.

## CONCLUSION

[¶ 27] We find sufficient evidence in the record to sustain Magallanes' conviction for first degree murder. Our review of the record also convinces us that trial counsel's assistance was not constitutionally deficient and that no prosecutorial misconduct occurred during closing argument. Affirmed.