2008 WY 103

**Kent Alan PROFFIT, Sr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0079.

Supreme Court of Wyoming.

Sept. 3, 2008.

Representing Appellant: Diane M. Lozano, Wyoming State Public Defender; Tina N. Kerin, Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Senior Assistant Attorney General. Argument by Mr. Causey.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Kent Alan Proffit, Sr. ("Proffit") was convicted following a jury trial of first degree murder and conspiracy to

commit first degree murder. He was sentenced to two consecutive terms of life imprisonment without the possibility of parole. On appeal, Proffit challenges several evidentiary rulings of the district court and assails the prosecutor for misconduct during closing argument. Finding no reversible error, we affirm.

## ISSUES

[¶ 2] Proffit presents the following issues for our review:

I. Did the trial court err in admitting hearsay statements of Chris Hicks?

II. Did the trial court commit reversible error when it did not allow defense expert witness Roger Willard to testify at the trial?

III. Did the trial court incorrectly allow law enforcement to offer hearsay statements of Jacob Martinez and Michael Seiser?

IV. Did the prosecutor commit misconduct when he objected to proposed defense evidence, and then mischaracterized the defense evidence in closing argument?

## FACTS

[¶ 3] During the fall of 2005, Proffit lived in a trailer home in Gillette with his son, Kent Proffit, Jr. Also living there were three young men, Chris Hicks, Jacob Martinez, and Jeremy Forquer. A frequent visitor to the trailer was Michael Seiser.

[¶ 4] In early September, Hicks told Martinez about a plot to bring a large quantity of marijuana, valued at around $500,000.00, to Gillette. Martinez agreed to help Hicks sell it. However, in mid-September something went wrong with the deal. Hicks received a telephone call advising him that the shipment of marijuana had been "lost," and that he would be held responsible for it. Hicks became visibly upset by this news, so much that he attempted to kill himself. When Martinez attempted to intervene in that effort, a fight

ensued and the others in the trailer became alarmed. Recognizing their alarm, Hicks and Martinez explained what had happened. Proffit told the young men that he had "connections" and could take care of the problem for them. After making a telephone call, Proffit assured the men that the situation had been resolved. Proffit also told them that they "owed him favors" for his involvement in and solution of the problem.

[¶ 5] Approximately a week later, Hicks and Martinez learned that their debt to Proffit would involve the murder of Forquer. At that time, Proffit told Hicks and Martinez that Forquer was "working for the cops" and that he needed to be eliminated. Over the next several weeks, Proffit, Hicks and Martinez discussed various ways the murder could be accomplished. Around mid-October, Proffit devised a plan in which Forquer would be tricked into a lethal chokehold by Hicks. According to the plan, Proffit would ask Hicks to show him a chokehold that would incapacitate a person; Hicks would agree to show him; they would get Forquer to volunteer for the demonstration; and Hicks would apply the chokehold on Forquer and continue to strangle him until he was dead.

[¶ 6] On October 28, Proffit decided to put the plan into action.[1] Around midnight, in accordance with the plan, Proffit asked Hicks to show him a chokehold that he could use to take a person down. When Hicks stated that he needed a demonstration partner, Forquer volunteered.[2] Hicks placed his arms around Forquer and choked him until he lost consciousness. Shortly thereafter, both men slumped to the floor. When Hicks indicated that he was tiring, Proffit directed Martinez to get a rope, which Martinez then tightened around Forquer's neck for several minutes until he was dead. Martinez also punched Forquer in his throat several times to ensure that Forquer could not regain his breath.

---

**1.** Seiser and Kent Proffit, Jr. were present in the trailer when the plan to kill Forquer was put into action, but took no part in the actual murder. Kent Proffit, Jr. apparently slept during the entire incident.

**2.** Prior to volunteering for the demonstration, Forquer was in his bedroom packing for a brief trip home to Missouri to visit his family.

[¶ 7] After talking and laughing about the murder, specifically the fact that Forquer had urinated on himself, Proffit, Hicks, Martinez, and Seiser began the process of cleaning the trailer and disposing of Forquer's personal belongings and any evidence related to his murder. Proffit directed Hicks and Martinez to clean the area and wipe down Forquer's body with a bleach solution, while he and Seiser gathered Forquer's personal belongings. At Proffit's direction, the young men then lined the trunk of Hicks' Dodge Intrepid with several large trash bags and placed Forquer's body inside, along with Forquer's personal belongings.

[¶ 8] The four men then got into the vehicle and drove away. At Proffit's direction, Hicks proceeded westbound on Interstate 90 toward Buffalo, Wyoming, to find a ravine wherein Forquer's body could be dumped. During the drive, Martinez tossed Forquer's wallet and cellular telephone out of the window. Before reaching Buffalo, they turned around and headed back toward Gillette. Eventually, Proffit found the perfect location. At Proffit's direction, the young men concealed Forquer's body under a large pine tree not too far from the highway. They then resumed their journey back to Gillette, disposing of the rest of Forquer's belongings at various locations along the highway.

[¶ 9] Forquer's murder came to light on December 23, 2005, when Martinez, who was incarcerated on charges relating to another murder, spoke to Lieutenant Eric Seeman of the Campbell County Sheriff's Department. Martinez explained how he, Hicks and Proffit killed Forquer and disposed of Forquer's body and personal belongings. He also directed law enforcement to the location where Forquer's body had been secreted.[3]

[¶ 10] Following his arrest on December 24, 2005, Proffit spoke with Lieutenant Seeman. Proffit admitted to being in the trailer at the time of Forquer's murder, and confirmed the manner in which Forquer was killed, including the use of the rope. He also admitted accompanying Hicks and Martinez on the excursion to dispose of Forquer's

body. Proffit, however, insisted that Forquer's death was an accident and that he tried to convince Hicks and Martinez to report it to the sheriff's office.

[¶ 11] Additional facts will be set forth as necessary to address the issues raised by Proffit.

## DISCUSSION

### A. Evidentiary Rulings

#### *Standard of Review*

[¶ 12] We recently reiterated the standard for reviewing challenges to the admission of evidence:

> Generally, decisions regarding the admissibility of evidence are entrusted to the sound discretion of the district court. *Law v. State,* 2004 WY 111, ¶ 14, 98 P.3d 181, 187 (Wyo.2004). We afford considerable deference to the district court's decision and, as long as a legitimate basis exists for the district court's ruling, it will not be reversed on appeal. *Id.* Under the abuse of discretion standard, our primary consideration is the reasonableness of the district court's decision. *Martin v. State,* 2007 WY 76, ¶ 20, 157 P.3d 923, 928 (Wyo.2007); *Wilde v. State,* 2003 WY 93, ¶ 13, 74 P.3d 699, 707 (Wyo.2003). The burden of establishing an abuse of discretion rests with the appellant. *Martin,* ¶ 20, 157 P.3d at 928.

> If we find that the district court erred in admitting the evidence, we must then determine whether or not the error affected [the appellant's] substantial rights, providing grounds for reversal, or whether the error was harmless. *See Skinner v. State,* 2001 WY 102, ¶ 25, 33 P.3d 758, 766–67 (Wyo.2001); W.R.A.P. 9.04; W.R.Cr.P. 52. The error is harmful if there is a reasonable possibility that the verdict might have been more favorable to [the appellant] if the error had never occurred. *Skinner,* ¶ 25, 33 P.3d at 767. To demonstrate harmful error, [the appellant] must prove prejudice under "circumstances which

---

**3.** Forquer's personal items were later found along the highway in the areas described by Martinez.

manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Id.* (quoting *Johnson v. State,* 790 P.2d 231, 232 (Wyo.1990)).

To the extent no objection is made at trial to the evidence challenged on appeal, our review is limited to determining whether plain error occurred. We will not find plain error unless: (1) the record clearly reflects the error; (2) the party claiming the error demonstrates that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way; and (3) the party proves that the violation adversely affected a substantial right resulting in material prejudice. *Lessard v. State,* 2007 WY 89, ¶ 14, 158 P.3d 698, 702 (Wyo.2007); *Cazier v. State,* 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo.2006); *Ogden v. State,* 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo.2001).

*Humphrey v. State,* 2008 WY 67, ¶¶ 44–46, 185 P.3d 1236, 1249–50 (Wyo.2008).

### Issue I—Hearsay statements of Chris Hicks

[¶ 13] At trial, Martinez testified, without objection, that Hicks told him in early September 2005 that he had arranged for a large quantity of marijuana, valued at approximately $500,000.00, to be delivered to Gillette for them to sell; Hicks subsequently received a telephone call around mid-September, during which he heard Hicks ask "not to be killed or not to be blamed for something he didn't do"; Hicks told Martinez that the shipment of marijuana had been "lost" and the supplier was holding him responsible for it; after Hicks told Proffit about the situation, Proffit informed them that he was "connected" and would take care of it; a day or two later, Proffit told them that they "owed him favors" for taking care of the problem; and Proffit later told them that one of the favors would be the killing of Forquer.

[¶ 14] Proffit now contends that plain error occurred when the district court admitted

into evidence Hicks' out-of-court statements to Martinez because the statements are hearsay[4] and do not qualify for admission under any of the hearsay exceptions. He also claims the admission of Hicks' statements violated his confrontation rights under both the state and federal constitutions.

[¶ 15] We recently rejected an identical argument in *Proffit v. State,* 2008 WY 102, 191 P.3d 963, 2008 WL 3980841 (Wyo.2008). In that case we determined:

Hicks' statements to Martinez would only be hearsay if they were being offered to prove the assertions being made by Hicks. Thus, the statements would be hearsay if they were being offered to prove, for instance, that Hicks had arranged a 500–pound marijuana deal, or that the deal had "gone bad," or that he and Martinez were being threatened with death. The statements were not, however, offered for that purpose. Rather, they were offered for the purpose of showing the effect the statements had upon Martinez and [Proffit] *See Kenyon v. State,* 986 P.2d 849, 853–54 (Wyo.1999) (credibility of the declarant not the issue).

The fact that Hicks' statements were not offered to prove the truth of the matter asserted also defeats [Proffit's] contention that admission of the statements violated his constitutional confrontation rights. *Crawford,* itself, notes that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford [v. Washington],* 541 U.S. [36], 59 n. 9, 124 S.Ct. [1354], 1369 n. 9[, 158 L.Ed.2d 177 (2004) ]; *Schultz v. State,* 2007 WY 162, ¶ 11, 169 P.3d 81, 85 (Wyo. 2007); *Szymanski v. State,* 2007 WY 139, ¶¶ 20–26, 166 P.3d 879, 884–86 (Wyo.2007). [*Proffit*] has failed to show plain error.

*Proffit,* ¶¶ 21–22, 191 P.3d at 970. Our decision in that case is equally dispositive of Proffit's claim in this case.[5]

---

**4.** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). Pursuant to W.R.E. 802, hearsay is inadmissible except as provided by court rules or by statute.

**5.** We recognize there are minor discrepancies in Martinez's testimony. However, we do not find those discrepancies significant as to alter our decision in this case.

## Issue II—Exclusion of expert testimony

[¶ 16] On the final day of trial, the State objected to the proposed testimony of defense expert witness, Roger Willard, whom the defense intended to testify about the investigation conducted in the case, including the interviews and the crime scene evidence collection.[6] The prosecutor argued that Willard should not be permitted to testify about the collection of "trace" evidence from the crime scenes because Willard's *curriculum vitae* did not show that he had any specialized training or experience in evidence collection. The prosecutor also argued that any testimony concerning police interrogation practices was not relevant to establish or dispute the existence of any facts at issue in the case, noting that there had been no issue raised during trial that police did anything improper during the interviews, nor was there any universally accepted policy or law mandating that law enforcement officers conduct their interviews in any specific manner.

[¶ 17] In response to the prosecutor's objection, the defense first argued that the prosecutor's objection was untimely and should have been raised earlier in the proceedings. The defense then briefly discussed Willard's background and his qualifications to testify generally about crime scene evidence collection and the protocols to be followed. In addition, after generally noting there were some discrepancies in Lieutenant Seeman's and Investigator Peyrot's recollection as to what Seiser had reported, the defense argued that Willard's proposed testimony was relevant, stating that the way law enforcement "conducted the interviews and the investigation is always relevant in any case to talk about." The prosecutor then questioned whether Willard's proposed testimony would entail improper comments upon the credibility of the officers, and reiterated his earlier argument concerning the lack of relevance Willard's testimony had to any issue contested at trial.

[¶ 18] Unable to determine whether the proposed testimony would be probative to any issue at trial or whether it was merely intended to impugn the credibility of the witnesses, the district court requested an offer of proof. During the offer of proof, defense counsel questioned Willard about his background, the materials he had reviewed, and about the substance of his proposed testimony. Willard testified that he had been in law enforcement since 1962 and was an "expert" in police policies and protocols. Although Willard believed that the officers conducting the interview had reconstructed their reports solely from their recollections, defense counsel was forced to correct Willard by pointing out that the officers actually had taken notes, which were then used to write their formal reports. Based on that information, Willard acknowledged that at least one of the primary protocols concerning police interviews was satisfied. However, Willard indicated that it was a "trend" in modern law enforcement to record interviews, especially those interviews conducted during the investigation of serious crimes, to ensure that the credibility of the investigation, the interviewing officer, and the person being interviewed is protected. Willard generally noted the differences in the statements of Martinez and Seiser and questioned whether "there was an opportunity for those two witnesses to compare their statements and to conspire to ensure that certain statements that they made were consistent."

[¶ 19] Willard also expressed some doubt as to the ability of the crime scene technicians to conduct a thorough investigation—specifically, the collection of evidence at the site where Forquer's body was found—at night via high-powered floodlights.[7] He testified that "standard protocol" would have been to secure the scene until the daylight hours when a more thorough examination could be performed. Finally, Willard testified that protocols were violated by the failure to conduct a forensic examination of the

---

6. The record indicates that the State did not receive any information before trial concerning the substance of Willard's testimony or his *curriculum vitae*.

7. The scene was processed by personnel from the Wyoming State Crime Laboratory and law enforcement on December 24, between the hours of 1:12 a.m. and 3:38 a.m., using large floodlights provided by the Campbell County Fire Department.

trailer home where the homicide occurred and the vehicle that was used to transfer Forquer's body.[8]

[¶ 20] On cross-examination, Willard acknowledged that, in spite of his personal belief that there was a "trend" in modern law enforcement to record interviews, many law enforcement agencies, including those in Colorado with which Willard was most familiar, did not require the recording of interviews. Willard also acknowledged that the "recording" protocols he espoused were actually suggested practices, and that he knew of no legal requirement for the recording of interviews. In addition, Willard indicated that if personnel from the Wyoming State Crime Laboratory had in fact conducted "trace" evidence collection from the trailer where Forquer was murdered and the car in which his body was transported, as well as the site where his body was found, the protocols for crime scene investigations would have been satisfied.

[¶ 21] Following Willard's testimony, defense counsel again generally argued that Willard's proposed expert testimony was relevant:

[DEFENSE COUNSEL]: Your Honor, I think I've explained my position on this already. I think that the relevance question concerning the investigation of this case, the interviews, the crime scene investigation, his testimony directly goes to the credibility of that investigation and allows, I think, the jury to consider that there are protocols that were not followed in this case that are generally accepted throughout the nation, and I think that's the impetus of his testimony and should be allowed.

The prosecutor countered:

[PROSECUTOR]: Your Honor, if that is the direction that the defense would intend this testimony to take, I believe that Mr. Willard's testimony would have to beat [sic] the *Daubert* test and there would have to be testimony by him that this is a generally accepted principle by everybody in the country, that it's set down nationwide protocol that all of the experts in the

field agree that the recording has to be done.

The best that he can do is tell you that it's a suggestion by nationwide police agencies. And more importantly, his testimony is that there's a trend across the country that there be recordings. There's no requirement legally by his testimony. There's no requirement constitutionally in Wyoming. And as a result of that, Your Honor, that testimony with respect to recording, is a lay witness' opinion that in his opinion this should have been recorded.

When you take it a step further and you consider his testimony, I can't remember how many times he said words like credibility and reliability and truthfulness, and clearly, that testimony is completely inappropriate for any witness to utter. He is defining for the jury how to evaluate each witness that has testified, and that's their job.

With respect to evidence collection, Your Honor, I don't think that's an issue anymore. The testimony before this Court from Agent Hamilton was that the crime lab processed all three scenes. He specifically testified he watched them take trace evidence, so it's not even relevant with respect to that area.

[¶ 22] After considering the offer of proof and counsel's arguments, the district court sustained the State's objection to Willard's testimony:

THE COURT: All right, And there are several things about this testimony that troubles me.

First, it appears that the witness did not have an understanding that notes were taken and then destroyed. It appears that his analysis initially of the statements was that the—essentially, law enforcement was reconstructing a report purely on memory. That's not the testimony.

Further, then we turn to the crime scene. His understanding was there was no trace evidence taken. That's not the evidence before the Court. The Court remembers specifically hearing from the crime lab, hearing about putting on special

8. Willard was apparently unaware that the trailer home and Hicks' vehicle were processed for evidence on December 24, 2005, the day after law enforcement learned of Forquer's murder.

suits for transporting the vehicle, other matters. As a consequence, it appears that that information was not supplied to this witness.

Turning then to the test of whether or not this witness' testimony would be, in fact, directly probative and helpful to the jury or whether it would merely confuse the issue, the Court finds that it has a greater capability of confusing the issue.

Finally, I don't—I'm not exactly sure whether this is a *Daubert* test or not.[9] It might be, and if it is, the *Daubert* standard has not been met. For that reason, the Court will sustain the State's objection.

[¶ 23] Proffit contends the district court erred in refusing to allow Willard to testify about what he perceived to be deficiencies in the investigation of Forquer's murder. Proffit claims the district court's erroneous ruling deprived him of his constitutional right to present a defense and his right to compulsory process.[10] In his argument, Proffit alludes to matters that were not presented to the district court. Our review on this issue, however, is limited to whether the district court's decision, given the evidence and arguments at the time, was reasonable.

[¶ 24] There is no question that a criminal defendant has the right to present evidence in his own defense. That right, however, is not unlimited. *Dysthe v. State*, 2003 WY 20, ¶ 5, 63 P.3d 875, 879 (Wyo.2003). For evidence to be admissible, it must be relevant. W.R.E. 402. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." W.R.E. 403.

[¶ 25] After a careful review of the record in this case, we agree with the district court that Willard's testimony was not relevant. The crux of Proffit's trial defense was that he was not involved in Forquer's murder and that the primary witnesses against him—Martinez and Seiser—were simply liars with ulterior motives. Although defense counsel did at times ask witnesses whether interviews were taped or crimes scenes were processed in a certain manner, the defense did not question the manner in which "trace" evidence was collected or processed, nor did the defense allege any improprieties in the interviews of Martinez and Seiser or question whether the recording of their statements would have made a difference in the stories they told. Willard's testimony therefore would not have proved or disproved any fact of consequence to the determination of the case. Furthermore, it is clear Willard's opinions that certain investigative protocols were not followed in this case, specifically the investigating officers' alleged failure to make notes of the interviews with Martinez and Seiser and the alleged failure to process the trailer and Hicks' car, had little to no basis in fact. As the district court determined, the admission of Willard's testimony in this regard in light of the other trial evidence would have only served to confuse the jury. Considering the extent of the trial evidence and defense counsel's offer of proof, we hold that the district court's exclusion of Willard's proposed testimony was reasonable.

*Issue III—Hearsay statements of Jacob Martinez and Michael Seiser*

[¶ 26] Proffit next claims the district court erred when it admitted the hearsay testimony of two law enforcement officers—Lieutenant Seeman and Investigator Duane Peyrot of the Campbell County Sheriff's De-

---

9. In *Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo.1999), this Court adopted the two-pronged test of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for determining the admissibility of expert testimony. The first prong requires the trial court to determine whether the expert's methodology is reliable. If the trial court concludes that it is reliable, then the court must determine whether the expert's proposed testimony is relevant. *Bunting*, 984 P.2d at 471–72.

10. A violation of the Sixth Amendment compulsory process clause occurs "when a defendant is arbitrarily deprived of testimony that would have been relevant, material, and vital to his defense." *Dysthe v. State*, 2003 WY 20, ¶ 5, 63 P.3d 875, 879 (Wyo.2003).

partment—who recounted what two other witnesses in the case, Jacob Martinez and Michael Seiser, told them about Forquer's murder. He insists the district court incorrectly determined that the out-of-court statements of Martinez and Seiser were admissible as "prior consistent statements" under W.R.E. 801(d)(1)(B) because the statements were made after the motive to fabricate their stories arose. W.R.E. 801(d)(1)(B) states:

(d) *Statements which are not hearsay.*—A statement is not hearsay if:

(1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

[¶ 27] Rule 801(d)(1)(B) does not contain a temporal requirement for admissibility of a prior consistent statement. That is, the rule permits the admission of a prior consistent statement regardless of whether it was made before or after the alleged improper influence or motive to fabricate arose. *Dike v. State*, 990 P.2d 1012, 1024 (Wyo. 1999). We have held that a prior consistent statement may be used as substantive evidence if the alleged improper motive or influence arose after the statement was made. *Id.*; *see also Montoya v. State*, 822 P.2d 363, 367 (Wyo.1991). However, if the prior consistent statement does not precede the alleged improper influence or motive, the statement may only be used for rehabilitative purposes. *Dike*, 990 P.2d at 1024. When a prior consistent statement is admissible only for rehabilitative purposes, a limiting instruction must be given, but only if requested. *Id.*

[¶ 28] Rule 801(d)(1)(B) allows for the use of a prior consistent statement to rehabilitate a witness whose credibility has been impeached. By its plain language, four requirements must be satisfied before a prior consistent statement may be properly admitted into evidence: "(1) The declarant testifies at trial; (2) the declarant is subject to cross-examination concerning the prior statement; (3) the prior statement is consistent with the declarant's trial testimony; and (4) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Martin v. State*, 2007 WY 76, ¶ 26, 157 P.3d 923, 929 (Wyo.2007). We have held that the fourth requirement does not mandate a specific allegation during cross-examination; rather, it may be made by implication or innuendo, and it may be found in the thrust of the defense theory and the testimony presented at trial. *Id.*; *see also Lancaster v. State*, 2002 WY 45, ¶ 18, 43 P.3d 80, 89 (Wyo.2002); *Alicea v. State*, 13 P.3d 693, 698–99 (Wyo.2000); *Humphrey v. State*, 962 P.2d 866, 872 (Wyo.1998).

[¶ 29] In this case, Proffit defended on the theory that both Martinez and Seiser had lied from the outset and falsely implicated him in Forquer's murder to garner leniency from the State. From opening statements to closing argument, and at every opportunity in between, Proffit vigorously attacked the men's credibility and attempted to discredit every aspect of their account of the events surrounding Forquer's death. Proffit's persistent attack on Martinez and Seiser opened the door for the State's use of their prior statements for rehabilitative purposes. Without belaboring the testimony, Lieutenant Seeman and Investigator Peyrot related what Martinez and Seiser had reported to them, and the statements were consistent with the men's trial testimony. Accordingly, the prior statements of Martinez and Seiser were properly admitted as nonhearsay under W.R.E. 801(d)(1)(B).

[¶ 30] Proffit relies heavily on *Wilde v. State*, 2003 WY 93, 74 P.3d 699 (Wyo.2003), claiming his case is factually similar and, therefore, we should likewise find reversible error. We disagree. *Wilde* involved the statements of a minor victim. In that case, Wilde attacked the competency and reliability of the victim. The State, in an attempt to bolster the victim's testimony, presented six witnesses—the mother, sister, police officer, physician, nurse and forensic interviewer—to whom the victim had told her story. Each of these witnesses then repeated the victim's story without much variation. It was under these specific circumstances—where six peo-

ple repeated the statements to the jury—that this Court found the trial court abused its discretion, amounting to reversible error. *Id.,* ¶ 14, 74 P.3d at 707–08. The facts in *Wilde* are clearly distinguishable from this case. Here, the same concerns are not present.

[¶ 31] Proffit also relies on *Dike v. State,* 990 P.2d 1012 (Wyo.1999), to support his argument that reversible error occurred. Proffit seems to be arguing that, because the statements were post-motive, the district court had a legal duty under *Dike* to *sua sponte* give a limiting instruction ensuring the jury considered the statements for the sole purpose of evaluating the credibility of Martinez and Seiser. *Dike,* however, imposed no such duty on the district court. Rather, *Dike* reiterated that a trial court's obligation to give a limiting instruction was predicated on a request by the defendant. In *Dike,* we declined to find reversible error in the trial court's failure to give a limiting instruction for the reason the defendant had not requested that one be given. *Id.* at 1024. In this case, Proffit did not ask for a limiting instruction. Accordingly, the district court was not legally obligated to give one, and no error can be premised on its failure to do so.

## B. Prosecutorial misconduct

[¶ 32] During the defense case-in-chief, defense counsel attempted to have Proffit's sister, Chris Adsit, testify that Proffit had borrowed $200.00 from her in October 2005 for the purpose of purchasing a bus ticket for Forquer to return home to Missouri. The prosecutor objected to Adsit's testimony on hearsay grounds. After an extended discussion, the district court ruled that Adsit's testimony about the reason Proffit sought the money was hearsay and, therefore, inadmissible. The court, however, allowed the defense the opportunity to show that Adsit sent Proffit a $200.00 check, a copy of which was admitted into evidence.

[¶ 33] During his closing argument, the prosecutor referenced Adsit's testimony concerning the money Proffit had borrowed from her:

> [PROSECUTOR] Good afternoon, ladies and gentlemen. In evaluating this case, the State would ask that you consider the bigger picture as you begin to look at the evidence and make your decisions.
>
> The bigger picture of this case began at a trailer ... depicted in evidence in State's Exhibit Number 23. In that trailer in September, October, November and December of last year, resided four young men; Jeremy Forquer, Jacob Martinez, Christopher Hicks and Kent Proffit, Junior.
>
> In early September of last year a fifth person entered that trailer and entered that big picture, and that fifth person is right over there, ladies and gentlemen, the defendant in this case and the father of Kent Proffit, Junior; Kent Proffit, Senior.
>
> You heard evidence describing the conditions in that trailer, ladies and gentlemen. You heard in that trailer was really nobody who had a job. Nobody had any means of income. **In fact, you even heard testimony from the defendant's own sister that sometime later in that year he had to borrow money from her.**
>
> With that background, ladies and gentlemen, the State would ask you to look at the evidence that you heard over the course of this trial. You heard testimony from two eyewitnesses to the crime that was—that occurred in this case. You heard testimony from Mike Seiser and Jacob Martinez. And that testimony, ladies and gentlemen, was consistent.

(Emphasis added.) The prosecutor then went over the evidence presented at trial, but did not mention Adsit's testimony again.

[¶ 34] Proffit contends that the prosecutor committed misconduct by objecting to the proposed testimony of Adsit as to the reason she had loaned him the $200.00, and then noting during closing argument the fact he had borrowed the money. He claims the manner in which the prosecutor referenced the money was improper. Proffit concedes he did not object to the prosecutor's comment and, consequently, his claim must be reviewed for plain error. As noted above, plain error exists if (1) the record clearly reflects the alleged error; (2) Proffit demonstrates a violation of a clear and unequivocal

rule of law; and (3) Proffit proves the error adversely affected a substantial right to his material prejudice. *Humphrey*, ¶ 46, 185 P.3d at 1249–50; *see also Magallanes v. State*, 2006 WY 119, ¶ 24, 142 P.3d 1147, 1154 (Wyo.2006); *Duke v. State*, 2004 WY 120, ¶ 101, 99 P.3d 928, 957 (Wyo.2004). To satisfy the prejudice prong, Proffit must demonstrate a reasonable possibility exists that, in the absence of the alleged error, the outcome of his trial would have been more favorable to him. *Magallanes*, ¶ 24, 142 P.3d at 1154; *Lopez v. State*, 2004 WY 103, ¶ 56, 98 P.3d 143, 157 (Wyo.2004).

[¶ 35] The first prong of the plain error test is met because the record clearly reflects the prosecutor's comment alleged as error. As to the second prong, Proffit contends the prosecutor's statement constituted a mischaracterization of the evidence and an impermissible attempt to mislead the jury regarding the appropriate inferences it could draw from that evidence—*i.e.*, that he was an "unemployed person sponging off his sister." According to Proffit, "[i]f the prosecutor knew the true inference of the evidence was that [he] wanted money to buy Mr. Forquer a bus ticket, then he should not have argued any other inference." He claims the prosecutor's comment violated the American Bar Association Standards for Criminal Justice endorsed by this Court in *Moe v. State*, 2005 WY 58, 110 P.3d 1206 (Wyo.2005), *Wilks v. State*, 2002 WY 100, 49 P.3d 975 (Wyo.2002), and *Trujillo v. State*, 2002 WY 51, 44 P.3d 22 (Wyo.2002). After a careful review of the cited authorities in light of the record in this case, we find no hint of prosecutorial misconduct. Defense counsel chose to introduce the evidence that Proffit had borrowed $200.00 from his sister. There was certainly nothing wrong with the prosecutor commenting on that evidence.

[¶ 36] We find it especially egregious that Proffit would select this trivial, isolated statement as grounds for an allegation of prosecutorial misconduct when he did not even attempt to demonstrate real prejudice from this comment. Proffit's argument on the prejudice component principally consists of a general condemnation of what he perceives is a widespread epidemic of prosecutorial misconduct in Wyoming and throughout the United States and the failure of appellate courts, including this Court, to curb that epidemic. Aside from that diatribe, Proffit makes no effort to explain, within the context of the evidence in this case, how the prosecutor's comment materially prejudiced him. Instead, he merely asserts that the prosecutor's conduct denied him a fair trial. Needless to say, Proffit's frivolous ranting and bald assertion of prejudice are wholly insufficient to satisfy the plain error standard. *Magallanes*, ¶ 25, 142 P.3d at 1154; *Doherty v. State*, 2006 WY 39, ¶ 23, 131 P.3d 963, 971 (Wyo.2006).

[¶ 37] Notwithstanding Proffit's poor argumentation, because of the severity of the charges and the attendant penalties, we have independently conducted a review of the challenged comment in light of the entire record and conclude that Proffit's complaint is meritless. The prosecutor's reference to Adsit's testimony was brief and was not intended to draw improper attention to any particular aspect of the case against Proffit. The prosecutor did not further mention Proffit's lack of income or the fact he had borrowed money from his sister.[11] Considering the overwhelming evidence against him, we do not believe the prosecutor's isolated statement about this infinitesimal matter had a substantial effect on the jury's determination of Proffit's guilt. We therefore conclude there is no reasonable possibility that the absence of the challenged comment would have led to a more favorable verdict. We find no plain error to warrant reversal of Proffit's convictions.

## CONCLUSION

[¶ 38] Proffit has failed to convince this Court that any reversible error exists with respect to any of the issues raised in this appeal. Affirmed.

---

11. We note that, although Adsit's testimony concerning the reason Proffit had borrowed the $200.00 was ruled inadmissible, defense counsel nevertheless stated during his closing argument that Proffit had borrowed the money for the purpose of purchasing a bus ticket for Forquer.