2012 WY 50

**Miachel G. MAIER, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. S–11–0070.

Supreme Court of Wyoming.

April 5, 2012.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Stewart M. Young, Faculty Director, Joshua B. Taylor, Student Director, Gregory Asay, Student Intern, of the Prosecution Assistance Program. Argument by Mr. Asay.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] Miachel G. Maier, the appellant, was convicted of both first-degree and attempted first-degree sexual assault. He now appeals those convictions, arguing that he was prejudiced by the admission of hearsay testimony and by prosecutorial misconduct in closing argument. He also argues that he was denied his right to effective assistance of counsel at trial due to his attorney's failure to object to either the hearsay testimony or the prosecutor's closing remarks. We affirm.

## ISSUES

[¶ 2] 1. Did the district court commit plain error by admitting hearsay testimony by one of the state's witnesses?

2. Did the prosecutor commit misconduct in the presentation of his closing argument?

3. Did defense counsel provide ineffective assistance by failing to object to the hearsay testimony and to the prosecutor's statements in his closing argument?

## FACTS

[¶ 3] On the night of January 8, 2010, MY and her friend, Charles Vitale (Vitale), went to the Hornet's Nest bar in Evanston, Wyoming. After a couple hours, the pair left and went to another bar, the Legal Tender. While there, MY's sister, TY, contacted her and asked her to pick up TY's boyfriend, the appellant, from work, and bring him to the bar. MY did so at approximately midnight. Over the course of the evening, MY consumed three beers and three shots of hard liquor.

[¶ 4] The appellant and MY disagree regarding their interactions while at the Legal Tender. MY testified that she barely spoke with the appellant and never danced with him, flirted with him, or kissed him. Vitale testified that he did not recall MY dancing with anyone or sitting on anyone's lap. Another member of the group at the bar, Michael Caves, agreed with Vitale that MY did not dance with anyone or sit on anyone's lap while at the Legal Tender. The appellant, on the other hand, testified that MY sat on his lap and was "flirting because she was kind of playing with her hair and smiling at me."

[¶ 5] Shortly before 2:00 a.m., TY picked up the appellant from the bar on her way home from work. At the same time, MY drove herself and Vitale in a separate vehicle to TY's apartment. At the time, MY lived in Salt Lake City and intended to spend the weekend at her sister's apartment. Shortly after arriving at TY's apartment, MY began to feel sick and went to the bathroom and passed out for a couple hours. TY left to go to work before 3:00 a.m., while MY was still in the bathroom. Eventually, MY tried to crawl to her sister's bedroom and remembers getting as far as the hallway, but has no recollection as to how she got into the bed. The appellant testified that he helped her to bed because she was stumbling and incoherent.

[¶ 6] MY woke up when she felt someone's fingers in her vagina. The appellant and MY disagree as to what happened next. MY testified that "I pulled up my pants and he pulled them back down and tried to stick his penis in me and I pulled them back up again." The appellant, on the other hand testified as follows:

> I pulled her panties to the side and I inserted my finger part way inside of her vagina; and she was somewhat moving her hips with it, so I thought that she was— I—I thought in my mind that she was liking it, so that's when I proceeded to pull out my penis and I touched her with it. But when she pulled up her pants, I was, like, all right, this isn't what she wants to do. I pulled up mine and I left the bedroom.

MY went back to sleep and stayed in bed until she woke up later that morning. Vitale and the appellant were already awake, and TY had just returned from work. The appellant's and MY's testimony differed as to MY's demeanor that morning. While MY contends that she immediately told Vitale that she wanted to leave, the appellant and TY testified that MY remained in the apartment living room with the group for about an hour before leaving. As Vitale was driving, MY told him that she thought she was raped by the appellant. Vitale took MY to her sister CY's house. After being informed of the events, CY called the police and took MY to the hospital.

[¶ 7] A couple weeks prior to these events, MY and TY were together at TY's apartment while the appellant was at work. They were both sending the appellant sexually explicit text messages regarding a potential three-way sexual act. The appellant told TY he didn't believe that MY wanted to participate. In response, TY took a picture of MY in her underwear and sent it to the appellant. A few days later, on December

28, the appellant and MY had the following exchange on Facebook:

> Appellant: I know this might sound a little weird but [TY] and [I] want to know if you want to have a threesome with us? [I]t has always been a fantasy of hers and we are really hopeing [sic] you will do this for us. Love, Mike
>
> MY: Dude your [sic] such a retard!!!! The answer would be no!!!

[¶ 8] The jury found the appellant guilty of sexual assault in the first degree and attempt to commit sexual assault in the first degree. The appellant now appeals those convictions.

## DISCUSSION

### Did the district court commit plain error by admitting hearsay testimony by one of the state's witnesses?

[¶ 9] The appellant argues that he was prejudiced by the admission of hearsay testimony at his trial. Because no objection was made to the testimony at trial, we will review for plain error. *Schreibvogel v. State,* 2010 WY 45, ¶ 26, 228 P.3d 874, 884 (Wyo. 2010). To establish plain error the appellant must prove the following three requirements: "(1) that the record clearly reflects the alleged error, (2) that a clear and unequivocal rule of law was violated, and (3) that the violation adversely affected a substantial right of [the appellant]'s to his material prejudice." *Foster v. State,* 2010 WY 8, ¶ 15, 224 P.3d 1, 7 (Wyo.2010).

[¶ 10] The prosecution's examination of witness Vitale elicited information regarding the conversation he had with MY when he drove her home from TY's house:

> [S]he told me that she was pretty sure that she was raped that night because she told me that she—she thought it was a dream at first and then she woke up and Miachel was on top of her and she felt something inside of her. But she wasn't sure for a while and took her thinking about it [sic] til we got home that she was sure—sure that it had even happened because she could feel it and remember it.

The record is clear as to the alleged error, meeting the first prong of plain error review.

[¶ 11] The appellant suggests that this statement amounts to hearsay and thus violates a "clear and unequivocal rule of law." *Cook v. State,* 7 P.3d 53, 56 (Wyo.2000). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). Generally, such a statement is inadmissible, unless some exception applies. W.R.E. 802. One such exception applies to prior statements by witnesses when "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." W.R.E. 801(d)(1)(B).

> Four requirements must be satisfied before a prior consistent statement will be properly admissible: (1) The declarant testifies at trial; (2) the declarant is subject to cross-examination concerning the prior statement; (3) the prior statement is consistent with the declarant's trial testimony; and (4) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

*Martin v. State,* 2007 WY 76, ¶ 26, 157 P.3d 923, 929 (Wyo.2007) (citing *Lancaster v. State,* 2002 WY 45, ¶ 17, 43 P.3d 80, 88 (Wyo.2002)). In the instant case, the declarant, MY, testified at trial and was subject to cross-examination, meeting the first two requirements.

[¶ 12] As to the third requirement that the prior statements be consistent with the declarant's testimony, we have stated "that it is the consistency, rather than the substance of the consistent statement, which takes such a statement out of the realm of objectionable hearsay and tends to prove the value of the original statement." *Lancaster,* 2002 WY 45, ¶ 17, 43 P.3d at 88–89 (quoting *Curl v. State,* 898 P.2d 369, 374 (Wyo.1995)). Vitale's testimony, that MY told him she was raped, was consistent with MY's trial testimony. She testified that the defendant inserted his finger into her vagina and attempted to insert

his penis into her vagina, both without her permission. Although these statements are not identical, the underlying assertions are consistent. Consistency does not require "virtual identity," provided "no material difference exists between the two accounts." *Curl*, 898 P.2d at 374, 375. Both statements consistently assert that the appellant touched MY against her will.

■ [¶ 13] Finally, to fit within the W.R.E. 801(d)(1)(B) exception, there must be an express or implied charge of recent fabrication or improper motive. "The charge of fabrication or improper motive need not come only as a specific allegation during cross-examination; rather, it may be made by implication or innuendo, and it may be found in the 'thrust' of the defenses and testimony presented." *Lancaster*, 2002 WY 45, ¶ 18, 43 P.3d at 89. The thrust of an argument will not amount to an implication of recent fabrication or improper motive where the argument is merely an attack on the witness's credibility. *Marquess v. State*, 2011 WY 95, ¶ 15, 256 P.3d 506, 511 (Wyo. 2011). "Likewise, [i]t has generally been held in state prosecutions that mere contradiction of a witness through the testimony of other witnesses or through attacks on the witness' reputation for truth or veracity are insufficient grounds for the admissibility of the witness' prior consistent statement." *Id.* (internal quotation marks omitted). The thrust of a defense strategy, if merely directed at questioning the witness' credibility, cannot overcome the explicit requirement that the statement "is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." W.R.E. 801(d)(1)(B). "[W]e have never held that an 801(d)(1)(B) prior consistent statement is admissible where no charge of recent fabrication, improper motive or influence is made at all. Any suggestion in Lancaster to the contrary is *dicta* and inconsistent with the plain language of the rule and our precedent." *Marquess*, 2011 WY 95, ¶ 16 n. 5, 256 P.3d at 512 n. 5.

[¶ 14] At trial, the thrust of the appellant's argument in his opening statement was that the appellant reasonably believed that MY had consented to sexual activity. The appellant also argued that MY told conflicting accounts of whether the appellant was on top of her when she woke up. On cross-examination of MY, the appellant questioned MY's honesty regarding the amount of alcohol she drank on the night in question and again suggested she changed her story with regard to whether she woke up with the appellant on top of her or next to her. The appellant also questioned whether MY told the interviewing officer the accurate time she left the Legal Tender. None of this amounts to a charge of recent fabrication or improper motive. The appellant is merely questioning MY's honesty and has not suggested any intervening event that would cause MY to change her story. *See Large v. State*, 2008 WY 22, ¶ 39, 177 P.3d 807, 819 (Wyo.2008) (Testimony was nonhearsay under W.R.E. 801(d)(1)(B) where there were accusations that the children's testimony was influenced and fabricated as the result of interviews with teachers and counselors.); *Proffit v. State*, 2008 WY 103, ¶ 29, 191 P.3d 974, 982 (Wyo.2008) (Nonhearsay under W.R.E. 801(d)(1)(B) where witness was accused of lying to gain leniency for himself); *Alicea v. State*, 13 P.3d 693, 699 (Wyo.2000) (Accusations of improper motive existed where the children testifying were accused of fabricating their testimony to get back at the appellant who banned them from his church youth group.).

[¶ 15] Not only must there be an accusation of recent fabrication or improper motive or influence due to some intervening event, the purpose of introducing the prior statement must be to rebut such an accusation. It seems evident that the fabrication of which the declarant is accused must relate to the prior consistent statement in that both statements support the same contention. Otherwise, the prior statement necessarily cannot serve to rebut such an accusation. Here, the appellant challenged the veracity of MY's testimony regarding what time she left the Legal Tender and whether the appellant was on top of her or next to her at the time of the attack. To qualify as 801(d)(1)(B) nonhearsay, MY's prior statement to Vitale that "she told me … she was raped" would have had to rebut an accusation that MY lied about what time she left the bar or where the

appellant was positioned when he touched her. The prior statement was not offered to rebut an express or implied charge against MY of recent fabrication or improper influence or motive, however, and therefore the testimony was inadmissible hearsay.

[¶ 16] Although Vitale's testimony included inadmissible hearsay, the appellant was not denied a substantial right, and therefore was not materially prejudiced. The elements of the crime of sexual assault were submitted to the jury as follows:

1. On or about the 9th day of January, 2010

2. In Uinta County, Wyoming

3. The Defendant, Michael [sic] Maier

4. Inflicted sexual intrusion on [MY] by putting his finger into her vagina [1]

5. When [MY] was physically helpless, and

6. Defendant knew or reasonably should have known that [MY], the victim, was physically helpless and had not consented.

Neither the date, nor the location of the incident, nor the identity of the appellant were contested. In his testimony, the appellant acknowledged that he put his finger into MY's vagina and that he touched her vagina with his penis in an attempt to have sex with MY.

[¶ 17] "Physically helpless" is defined as "unconscious, asleep or otherwise physically unable to communicate unwillingness to act." Wyo. Stat. Ann. § 6–2–301(a)(iii) (LexisNexis 2011). The emphasis is on the victim's inability to communicate, rather than any size or power differentials between the victim and the aggressor. *Haynes v. State*, 2008 WY 75, ¶ 21, 186 P.3d 1204, 1209 (Wyo.2008). The appellant testified that MY was intoxicated at the bar and that he offered MY a ride to TY's apartment because he was concerned that she was too drunk to drive and that MY continued to drink once they arrived at the apartment. He further stated that MY soon ended up on the floor of the bathroom, "hugging the toilet," and needed to be physically removed so that other people could use the restroom. MY returned to the bathroom, again preventing others from using the facilities. Despite the fact that MY had visited TY's apartment a number of times and was certainly well aware that the apartment contained only one bathroom, in her diminished capacity she told the other guests to use the second restroom. The appellant described MY's condition while in the bathroom:

> She was kind of just laying there [in the bathroom] on the pile of clothes that we had in there, kind of hugging them. She was—I couldn't tell if she was really passed out or somewhat coherent. She was moving a little bit, but that's all I could tell. I couldn't tell if she was really passed out or not.

The appellant observed MY crawling and stumbling toward the bedroom. The appellant also testified that MY was having a hard time speaking:

> Q: From the time she was—you were helping her out of the bathroom to the time you guys were getting in the bed was there any conversation going on?
>
> A: She was trying to say something to me, but I couldn't understand her.
>
> Q: Okay. Did you say anything to her?
>
> A: I just kept saying, "All right. Let's go, you drunk."

After the appellant helped MY into the bed, he got into bed behind her and adjusted her underwear to ease his access to her vagina.

[¶ 18] In *CSC v. State*, the appellant appealed his conviction of aiding and abetting in the commission of first-degree sexual assault. 2005 WY 106, ¶ 12, 118 P.3d 970, 974 (Wyo.2005). As in the instant case, conviction required that the appellant "knew or reasonably should have known that [the victim] was physically helpless." *Id.* CSC observed the victim participate in a "chugging contest," and saw her stumble as her assailant "helped" her to the bedroom. *Id.* at ¶ 15, 118 P.3d at 974. He also witnessed the assailant remove the victim's clothes and knew that he intended to have sexual inter-

---

1. This element in the instruction on Attempted Sexual Assault is written as "Attempted to inflict sexual intrusion on [MY]." All other elements are identical to those in the Sexual Assault instruction.

course with the victim. *Id.* at ¶ 14, 118 P.3d at 974. This Court ruled that the foregoing was a sufficient factual basis to support a guilty plea. *Id.* at ¶ 15, 118 P.3d at 974. Likewise, here, the appellant testified that he observed MY drinking to the point of intoxication, that she passed out on the bathroom floor, that she was unable to walk, and that he could not understand her when she tried to speak. Although the appellant disputes that he pulled down her pants, he testified that he adjusted her underwear so he could touch her vagina. It is irrelevant that the appellant thought MY was enjoying this or that she may have been flirtatious earlier. The appellant reasonably should have known that she was incapable of conveying a lack of consent and was therefore physically helpless. The appellant admitted to all of the elements of the crime other than MY's physical helplessness, and on that point he provided the jury with sufficient testimony to convict. The appellant was not denied a substantial right as a result of the admission of hearsay and therefore was not prejudiced.

### Did the prosecutor commit misconduct in the presentation of his closing argument?

■ [¶ 19] At the trial's conclusion, the prosecutor presented his closing argument. He referred to Detective Smith's testimony that when the appellant was initially interviewed by the investigating detectives, the appellant merely said that he helped MY to bed—he made no mention of any subsequent sexual activity. It was only after the detectives told him that a DNA test had been performed on MY and requested that appellant produce a DNA sample, that the appellant informed the detectives that MY had been flirtatious earlier in the evening and then admitted he had digitally penetrated MY's vagina and attempted to do so with his penis. The prosecutor continued:

> If he didn't know she hadn't consented, if he didn't know that she was passed out and he took advantage of it, why hide that fact? Why completely omit that fact? *He explained to the police that "When she was crawling, her pants came down and she looked back and saw me and that*

*must be where she got this crazy idea. That must be where the mistake came."*

*The problem with alcohol is alcohol makes an easy victim. Alcohol makes an easy victim. Alcohol also makes it more difficult to believe the victim. You'll notice the first story that was told, that's how he used it. "You can't believe her. She was out of it. She was wiped out. You know, she crawled and saw me. That must be where she has this crazy thought in her mind."*

> Interestingly, I saw an article about Yellowstone. It talked about the elk were getting lung infections. They found out it was a parasite that would dig into the lungs and that parasite actually created the signs of a pheromone thing. It infects the lungs and is kind of a pneumonia-type thing. A scent goes out and attracts wolves. The wolves start pushing the herd. *The one with the infected lung falls behind, is separated, and that's the target.*

> In this case, what we have was alcohol being used; the intoxication, the struggle that she was having at that time. Easy target. An easy target, which we found out later in the trial that he had sexual desires for, anyway. *She gets separated out. First, in the bathroom; then taken to the bedroom. People are asleep. Nobody else around. And he acts.*

(Emphasis added.) Although no objection was made at the trial, the appellant now argues that the above-emphasized language amounts to prosecutorial misconduct. The appellant claims that the prosecutor "misstated the facts in evidence" and improperly "compared MY to the infected elk."

■ [¶ 20] Because no objection was made to the foregoing statements at trial, we will review for plain error.

> [The appellant] made no objection to the prosecutor's closing argument. The general rule in Wyoming is that a failure to interpose a timely objection to improper argument is treated as a waiver, unless the prosecutor's misconduct is so flagrant as to constitute plain error, requiring reversal. A plain error analysis requires the appel-

lant to demonstrate the violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice.

*Trujillo v. State,* 2002 WY 51, ¶ 4, 44 P.3d 22, 23–24 (Wyo.2002) (internal citations omitted). We must look at the entire record to determine if the appellant was so prejudiced that any misconduct resulted in the denial of a fair trial. *Burton v. State,* 2002 WY 71, ¶ 11, 46 P.3d 309, 313 (Wyo.2002).

 [¶ 21] "In analyzing claims of prosecutorial misconduct, we consider the prosecutor's argument in the context in which it was made and with regard to the evidence produced at trial." *Trujillo,* 2002 WY 51, ¶ 5, 44 P.3d at 24. The statements with which the appellant takes issue were made by the prosecutor while inquiring why the appellant failed initially to tell the detectives about his sexual contact with MY. "[Prosecutors] may review the evidence and suggest to the jury inferences based thereon. The purpose of closing arguments is to allow counsel to offer ways of viewing the significance of the evidence." *Browder v. State,* 639 P.2d 889, 893 (Wyo.1982). The main point of contention in this case was whether the appellant reasonably should have known that MY was incapable of consenting. The prosecutor's statements suggest that the appellant deceived the detectives because he knew MY had not consented. The appellant attempted to bolster his argument by suggesting that MY had been flirtatious that evening. Although it appeared in quotations in the trial transcript, the prosecutor never suggested that the appellant's statement regarding MY's "crazy idea" was meant to be a literal quote from the detective's testimony. Rather, his purpose seems to have been to suggest to the jury that the appellant initially lied to protect himself and to cast doubt on MY's version of the events. This interpretation of the evidence was reasonable.

[¶ 22] The appellant also suggests that the elk metaphor was inappropriate. Although perhaps not a traditional method of persuasion, this story was actually a reasonable parallel to the events as elicited at trial. The evidence suggests, and the appellant has acknowledged, that MY drank to the point of intoxication and left the group to be alone in the bathroom when she became unwell. Aware that MY was passed out on the floor, the appellant later helped MY into bed where he inserted his finger into her vagina and attempted to do so with his penis. In the elk story, the sick elk fall behind the rest of the pack and become separated and are subsequently attacked by the wolves. Although MY's fate was not as dire as that of the elk, the prosecutor only suggested that both the elk and MY were incapacitated and alone and, therefore, subject to attack. The elk metaphor provided the jury with a reasonable summary of the evidence presented at trial.

[¶ 23] The prosecutor's statements in his closing argument did not amount to misconduct.

### Did defense counsel provide ineffective assistance by failing to object to the hearsay testimony and to the prosecutor's statements in his closing argument?

 [¶ 24] The appellant argues that he was denied his right to effective assistance of counsel due to defense counsel's failure to object to both the aforementioned hearsay testimony and the prosecutor's closing argument. Claims of ineffective assistance of counsel will be reviewed *de novo.* *Proffit v. State,* 2008 WY 114, ¶ 33, 193 P.3d 228, 241 (Wyo.2008). Counsel's assistance will be found so defective as to require reversal of the conviction only when the following two requirements are met:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Dickeson v. State,* 843 P.2d 606, 609 (Wyo. 1992) (quoting *Strickland v. Washington,* 466

U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)).

[¶ 25] Defense counsel's performance was not deficient due to his failure to object to the hearsay testimony or to the prosecutor's closing arguments. Although we agree that impermissible hearsay was presented to the jury, we do not find that counsel's failure to object to this admission was "so serious that defense counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The appellant asserts, without further analysis or citation to legal authority, that trial counsel's performance was deficient simply because "testimony that was inappropriate and prejudicial was presented to the jury without objection." This argument does not adequately establish that trial counsel failed to "render such assistance as would have been offered by a reasonably competent attorney[.]" *Teniente v. State,* 2007 WY 165, ¶ 74, 169 P.3d 512, 533 (Wyo.2007). The appellant has the burden of establishing that counsel was ineffective and this argument does not adequately address how defense counsel's failure to object amounted to deficient performance. *Id.* Additionally, as stated above, *see supra* ¶¶ 20–22, the statements made by the prosecutor in his closing argument did not amount to misconduct and were reasonable inferences drawn from the evidence as submitted at trial, and therefore were not objectionable.

[¶ 26] The appellant was not denied his right to effective assistance of counsel.

## CONCLUSION

[¶ 27] The appellant argues his convictions should be reversed because he was prejudiced by the admission of hearsay testimony and by prosecutorial misconduct in closing argument. Although we agree that inadmissible hearsay was presented to the jury, the appellant was not prejudiced as a result. The appellant's own testimony provided the jury with sufficient evidence upon which to convict. The prosecutor's statements in his closing argument represented reasonable inferences drawn from the evidence as elicited at trial and fairly summarized the main facts of the case. The appellant also argues that he was denied his right

to effective assistance of counsel for failure to object to the hearsay testimony and to the prosecutor's closing argument. The appellant failed to demonstrate that his trial counsel's performance was so deficient as to require reversal of his conviction.

[¶ 28] We affirm.